The jurisdiction of a foreign court may be examined, not only as to the authority under which it is erected, but as to the subject over which it is exercised; but if the court is duly constituted, and has jurisdiction over the subject, its decrees *in rem* cannot be revised by the court of another nation.

The arrêtés of the *French* consuls and commanders in *St. Domingo,* interdicting trade with the blacks of that island, are not to be considered simply as municipal laws, but as connected with a state of war with revolted subjects; and it is therefore competent to *France* to vindicate those laws, upon the ocean, beyond the limits of her own territory. But supposing them to be purely municipal, there seems to be nothing in the law of nations to prevent any sovereign from punishing the violation of his penal municipal laws, by seizure on the high seas, out of his own territory, and not within the territory of any other sovereign.

The decree of a foreign prize tribunal of general jurisdiction, condemning property for having been concerned in the violation of law, is conclusive upon the point that the seizure of the property was made in conformity with the law, it being a matter within their jurisdiction to decide.

It is not necessary in order to give jurisdiction to a prize court, that the property captured should have been brought within the dominions of the captor. Seizure and safe possession are all that are necessary to give jurisdiction, and whether the possession be within the dominions of the captor, or of a neutral, is immaterial. The possession of the particular captor is the possession of his sovereign every where. And although the property has been sold as perishable goods by the prize agent with whom the papers were deposited by the captor, and taken into the neutral country of the owner before condemnation, still the condemnation is valid, and confirms the original taking.

A court of common law has no jurisdiction of a cause whose object it is to recover property taken and condemned as prize, for having contravened a law of *France* interdicting trade with her revolted subjects in *Saint Domingo.*

## CHÉRIOT *against* FOUSSAT.

THIS was an action of replevin for 58 hogsheads and 830 bags of coffee, and 23 bales and 3 bags of cotton. The cause was tried before the Chief Justice at a *Nisi Prius* in *March* last, under the plea of *property*, when the jury found a verdict for the plaintiff, 19,296 dollars 27 cents damages; and now upon a motion by the defendant for a new trial, the case from the report of the Chief Justice appeared to be as follows:

The plaintiff, a citizen of the *United States* residing in *New York*, chartered the schooner *Mars*, captain *Hammond*, in *December* 1803, for a voyage from *New York* to *Jeremie* in the island of *Saint Domingo*, and back. On the 5th of *January* 1804, the schooner arrived at *Jeremie*, where she sold her outward cargo, and took on board a quantity of coffee and cotton for the plaintiff's account, with which she sailed for *New York* on the 2d of *February*. On the next day, when the *Mars*, *according to the captain's protest*, was about five leagues distant to the northwest of *Cape Donna Maria*, she was captured by two *French* privateers, who, after taking out the captain, supercargo and crew, and sending them in an *American* vessel to *Jamaica*, put two prizemasters on board the *Mars*, and ordered her to *St. Jago de Cuba*. The supercargo of the *Mars* proceeded from *Jamaica* to *St. Jago*, where he arrived on the 25th of *February*, and found the

*Mars* lying at anchor completely unloaded, but saw no part of the cargo. He then sailed for *Philadelphia*, where he arrived the 11th of *April*, and about two days after his arrival found a part of the cargo of the *Mars* at an auction store, to which it had been sent by the defendant, and where he finally identified by the marks and numbers, notwithstanding an effort had been made by some person to efface them, 47 hogsheads and 733 bags of the coffee he had shipt on board the *Mars* at *Jeremie*. The plaintiff then instituted this action.

The defendant admitted the 47 hogsheads and 733 bags of coffee to have been part of the cargo of the *Mars*, and claimed it as his own property under the following evidence:

In the same month of *December* 1803, the defendant, a citizen of the *United States* residing, in *Philadelphia*, chartered the schooner *Two Brothers* for a voyage to *St. Jago de Cuba* and back, and despatched her to that port in the beginning of *January*, with a cargo of dry goods &c. on his own account. She arrived at *St. Jago in sixteen* days, where she sold her cargo; and the laws of *Spain* there in force, not permitting a foreigner to carry on trade and merchandise or to buy and sell himself, but obliging him to employ a resident merchant, the supercargo employed as his factor one *Don Augustin de la Texera*, in whose name he purchased on the 14th of *February* a return cargo of coffee (the property in question) cotton and segars from two merchants of *St. Jago*, and paid for it with the proceeds of the outward cargo. The supercargo swore that the coffee and cotton &c. were shewn to him in the stores of the merchants where they were purchased, and were brought in canoes from the shore to the schooner which sailed with them for *Philadelphia* about the 20th of *February*; that he did not understand when he purchased them, that they proceeded from an *American* or other prize, nor did he understand or hear any thing tending to create a doubt or suspicion of the title of the persons who sold the same, but made the purchase fairly and *bona fide*, in the usual mercantile manner, and in the regular course of business.

The defendant then gave in evidence the following order of sale, by *John Baptiste Audibert*, together with the certificate of the *American* consul at *St. Jago*, that *Audibert*

1810.

CHERIOT
v.
FOUSSAT.

was, by the people of the *French* nation in *St. Jago,* ac-knowledged as commissary of the *French Republic,* in which capacity he acted in that city.

"18th *Pluviose,*} In the name of the *French* govern-
Year 12.    } ment. Extract from the minutes of the agency of the *French* government for the island of *Cuba.*

"I *Jean Baptiste Audibert,* commissary of marine, and *French* agent for the island of *Cuba,* having the charge of bringing suits *in cases of prize* in this island,—

"Considering the request made to me by the citizen *Pierre Descombre,* prizemaster of the *American* prize called the *Mars,* for authorizing the sale of the merchandise be-longing to the said schooner *Mars* of *New York,* commanded by captain *Ansel Hammond,* captured by the two *French* pri-vateers, the *Coquette,* captain *Bouchet,* armed for a cruise in virtue of a commission granted by the captain general of *Guadaloupe,* on the 16th *Frimaire* of the present year, and the *Serpent,* captain *Anderson,* armed in virtue of a letter of marque dated the 17th *Fructidor* year 11, granted by gene-ral *Rochambeau,* captain general of *St. Domingo,*—

"Considering that the said request is founded on the damaged state in which the said captured schooner is at present, that she takes in so much water as to make it feared that the goods on board said vessel may be damaged thereby, which I myself have ascertained by going on board said prize, and by the examination made by me in the damaged parts of the said vessel,—

"Considering that while waiting for the definitive judg-ment which shall be pronounced on said prize by the com-petent tribunal, it will be for the mutual benefit both of the captors and captured, that a measure for the preservation of their interests should be taken, to prevent the waste in the merchandise of which the cargo of the said schooner *Mars* is composed, and that a prompt sale of those articles, is a matter of material consequence to either party,—

"*In virtue of the powers vested in me by my government, and in conformity with my instructions, which authorize me to permit the sale of the cargoes of vessels captured from the enemies of the Republic, and of those found contravening the*

*laws upon the coasts of* Saint Domingo, *without waiting for the definitive sentence,—*

" And in consideration of the urgent motives aforesaid, as well for the interests of the captors as for those of the captured,—

" I authorize the said citizen *Pierre Descombre*, the prize-master having charge of the *American* prize called the *Mars*, to sell for cash to the highest and best bidder, the cargo of the schooner *Mars*, proceeding from *New York*, and captured in consequence of having had communication and traded with the brigands of *St. Domingo*,—

" On condition that the said citizen *Pierre Descombre*, shall deposit the sums arising from the said sale in the hands of the citizen *Dallest* a *French* merchant established in this city, there to remain until the definitive sentence be pronounced, in order that the same may be delivered to the parties whose claim may be substantiated before the tribunals.

" Given at *St. Jago de Cuba*, 18th *Pluviose*, year 12 of the *French Republic*." [6th *February* 1804.]    " AUDIBERT."

He also gave in evidence the following decrees, condemning the cargo of the *Mars* as prize to the captors:

" In the name of the government. The provisional commission of justice established at *Santo Domingo*, deciding in the first instance *in cases of prize*, in virtue of the arrêté of the consuls of the republic of the 12th *Vendemiaire* year 11, [4th *October* 1802] on captures of vessels found contravening the laws and regulations concerning *French* commerce, and that of foreigners, with the *French* colony of *St. Domingo*,* has pronounced the following judgment;—

___

* The following notification was communicated to the *American* government and published in the public papers, by Mr. *Pichon* the *French charge des affaires* on the 18th *March* 1802:

" The undersigned, commissary general, and charge des affaires of the *French* republic, gives information to all persons whom it may concern, that in consequence of the revolt of the negroes in *St. Domingo*, all manner of intercourse is by order of the commander in chief for the *French* republic in that island, prohibited to foreigners, with any other part of the island, but the two ports of *Cape Francois* and *Port Republicain*. Cruisers will arrest all foreign vessels attempting to enter any other port, and to

" Having seen the documents produced in favour of the validity of the prize, in the suit instituted by the citizen *Audibert*, *French* agent at the island of *Cuba*, at the request of the owners of the *French* privateers, the *Coquette*, captain *Bouchet*, and the *Serpent*, captain *Anderson*, that the capture by them made of the *American* schooner *Mars*, captain *Hammond*, should be declared good and legal, which documents are as follows; [Here followed a list of the documents of vessel, cargo &c. &c.]

" Considering that it results from all the papers of the schooner *Mars*, that captain *Ansel Hammond* has communicated with the rebels of *St. Domingo*, and that he has traded with them,—

" Having seen the 4th article of the arrêté of the captain general of the 17th *Vendemiaire*, year 11, [9th *October* 1802] as follows—" *All coasting or other vessels, found communica-* " *ting with the places on the coast occupied by the rebels, shall* " *be seized, and the vessel and cargo confiscated,*"—

" Having also seen the first article of the arrêté of the captain general, dated the 10th *Ventose* last, [1st *March* 1804] as follows: " *The port of Santo Domingo is the only one in* " *the colony of St. Domingo open to French and foreign com-* " *merce. Consequently every vessel anchored in the bays, creeks* " *or landings on the coast in the possession of the rebels,*—" *those going to ports in their possession, or returning from* " *the same, with or without cargoes,*—*and generally every* " *vessel under sail within the territorial extent of the island,*

communicate with the revolted negroes, to carry either ammunition or provisions to them. Such vessels shall be confiscated, and the commanders severely punished, as violating the rights of the *French* republic, and the laws of nations.

" Fair and regular traders will meet with encouragement and protec- tion at the above mentioned places, from the general in chief, and subor- dinate authorities.

" The intercourse between the *United States* and these two ports is left open to the *American* trade. It will be advisable for merchants who make shipments to the colony, and who wish to meet no interruption by incur- ring suspicion of improper conduct, to take proper certificates from the commissioners or commercial agents of the *French* republic in the *United States*, who are instructed to deliver them to the applicants.

" Given at *Georgetown*, *District of Columbia*, the 27th *Ventose*, 10th year of the *French* republic. 18th *March* 1802. *L. A. Pichon.*"

" (except from Cape Rafael to the bay of Ocoa) *which may* " *be found at a distance less than two leagues from the coast,* " *shall be seized by the vessels of the government, and by the* " *privateers bearing our letters of marque, who shall bring* " *them as soon as possible into the port of Santo Domingo, in* " *order that the confiscation of the said vessels and cargoes may* " *be pronounced.*"

" The provisional commission of justice, acknowledging the correctness of the arguments of the commissary of government, declares and adjudges, that the *American* schooner *Mars*, of *New York*, captured by the *French* privateers the *Coquette* and the *Serpent*, with a cargo of cotton and coffee, coming from *Jeremie, is a good prize*, and is confiscated for the benefit of the captors. In consequence whereof, that the said schooner, her tackle and apparel and cargo, shall be sold in the usual manner, in order that the product arising from the said sale, may be divided between the captors, a deduction being first made from the whole, of the judicial charges and duties to the republic. Which shall be executed, saving the right of appeal."

" Thus done and adjudged at *Santo Domingo* in the hall of justice, at a public audience on this day the 1st *Thermidor*, 12th year of the republic." [20th *July* 1804] *Rigaud, Coca, Franco, Lavistida, Marie*, members. *Lemaire* Secry."

" In the name of the *French* government. Sitting of the 7th *Thermidor* in the 12th year of the *French* republic, (26th *July* 1804) presided by general *Ferrand*, captain general and commander in chief of the island of *St. Domingo*, at which were present the citizens *Dubuisson* &c."——

" The special commission of appeal *in matter of prize*, established by the arrêté of the general in chief, *Ferrand*, captain general, bearing date the 6th *Nivose* last, (28th *December* 1803) conformably to the arrêté of the consuls of the *French* republic of the 12th *Vendemiaire* 11th year* (4th *October* 1802) to decide definitively on the appeals from the judgments given in the first instance by the provisional commission of justice, sitting in the city of *Santo Domingo*, concerning the prizes made by the vessels of the state and the

---

* For a copy of this arrêté, See 4 *Cranch*. 246.

1810.

CHERIOT
v.
FOUSSAT.

*French* privateers, on neutrals taken and suspected to be acting in contravention of the laws and regulations concerning the *French* and foreign commerce,—

" In the suit appealed from, instituted at the request of the owners, captain, officers, and crews of the *French* privateers *La Coquetté*, captain *Bouchet*, and *Le Serpent*, captain *Anderson*, petitioners for the validity of the prize of the one part, against the captain and owners of the *American* schooner *Mars* of *New York*, *Ansel Hammond*, master, captured by the said privateers, absent defendants of the other part,— Present, commissary of the government for the greater regularity of the proceedings in the cause, and for the preservation of the interest of whom it may concern,

" Has given the following decree.

" After having heard the report of citizen *Saint Paul*, judge reporter of the said commission, together with the opinion of citizen *Daubermont*, marine inspector, acting as agent of the government,—

" Having seen the documents of the said suit to the number of 24, together with the judgment given the 1st *Thermidor* instant (20th *July* 1804) by the provisional commission of justice sitting in this city, on the report of the citizen commissary of the government, and the appeal from the same, dated the same day; the whole seen and maturely considered,—

" Considering that it results from all the ship papers of the schooner *Mars*, that the captain *Ansel Hammond* has communicated and traded with the rebels of *St. Domingo*,—

· " Having seen the fourth article of the arrêté of the captain general *Le Clerc*, bearing date the 17th *Vendemiaire* 11th year, ( 9th *October* 1802)—

" The special commission decreeing on the appeal from the judgment given by the provisional commission of justice the 1st *Thermidor* instant, (20th *July* 1804) and acceding thereto, does declare the *American* schooner *Mars*, to be *good and lawful prize*, affirms the judgment given, and dismisses the appeal as unfounded. In consequence it is decreed by the court here, that the same shall be intirely executed, and that all costs of suit, as well in the first instance, as in the appellate cause, shall be deducted out of the proceeds of the sale

of the schooner and cargo in question, *conformably to the marine ordinance of* 1681, and the arrêtés of the council of state of the 8th *March* and 23d *December* 1705.

" Moreover it is decreed that an exemplification of the present judgment shall be addressed to the commissary of the government near the provisional commission of justice, to be by him transmitted to the agent of *St. Domingo* at *St. Jago de Cuba*, who is charged with its execution, and to see that as well the duties due to the government, as the charges and costs arising to the provisional commission of justice, and to the special appellate court, be duly paid.

" Done at *Santo Domingo* in the hall of the government, the day month and year as abovesaid. *Ferrand*, president, *Auger*, secretary."

At the instance of the defendant's counsel, two points were reserved at the trial, by the Chief Justice. 1. Whether the protest of the captain was competent evidence;* 2. Whether

* The objections taken to the protest, were,

1. That it was sworn to before a magistrate, the notary certifying that the magistrate had authority to administer oaths; whereas, the protest should be made before a notary, if there was one in the place. *Boyce* v. *Moore*, 2 *Dall.* 196.

2. That it should be made by the captain and a majority of the crew, whereas this was made by the captain and supercargo only. *Richette* v. *Stewart*, 1 *Dall.* 318.

3. That between these parties it was not evidence, as in practice it had been admitted only between insurers and insured, and in commercial cases; and it was a paper so generally rejected by courts out of this state, so scrupulously watched by the courts within this state when admitted, and so repugnant to the general principles of evidence, that it ought never to be received except in a case for which there was a clear precedent. *Nixon* v. *Long*, 1 *Dall.* 6., *Story* v. *Strettell*, 1 *Dall.* 10., *Richette* v. *Stewart*, 1 *Dall.* 318., *Westcott on Ins.* 432., 1 *Valin* 382., *Brown* v. *Girard*, 1 *Binney* 41., 2 *Marsh.* 616., *Senat* v. *Porter*, 7 *D. and E.* 158.

The answers to these objections were,

1. That the *noting*, which was the substantial part of the protest, was done by the notary at *Kingston*, and it should be presumed that he had not power to administer an oath.

2. That not an instance in this state could be adduced, in which a protest had been rejected because a majority of the crew were not sworn, the opinion in *Richette* v. *Stewart* being merely a' dictum; and it was commonly the practice for the captain to do it alone, or with an officer and a seaman or two, without reference to the majority.

1810.

CHERIOT
v.
FOUSSAT.

this court had jurisdiction of the case, it being connected with asserted matter of prize.

On the general question, it was contended for the defendant, that the property was devested from the plaintiff, and transferred to him; 1. By the operation of the *Spanish* law upon his *bona fide* purchase at *St. Jago*, without notice of the plaintiff's claim.* 2. By virtue of the decrees of the

3. That a protest had been admitted by President *Biddle* in an action by the shipper of goods against the captain; *Gilchrist* v. *Ward;* and that upon searching the record of *Nixon* v. *Long*, the parent case upon this subject, it appeared that the action was *covenant* by the owners of a vessel against the charterers, to recover freight according to a charter party; the plea, that the vessel returned empty and no freight was due; the replication, that it was by the default of defendants; and the captain's protest, made by himself *alone*, was admitted in evidence.

TILGHMAN C. J. Two objections have been made to the *form* of the protest. 1. That it is not accompanied by a majority of the crew. Although it has been *said* in one of the cases cited from *Dallas*, that this was necessary, yet it has never been decided so, and I think the practice has been to the contrary. Indeed it now appears from the record in *Nixon* v. *Long*, the foundation of the law in *Pennsylvania*, that the captain *alone* protested. 2. The next objection is that the protest was not before the notary; but it appears that the protest was first *noted* before the notary, and then sworn before a magistrate. It was afterwards formally extended by the notary, who certifies that the magistrate had power to administer the oath. The notary, unless authorized by the law of *Jamaica*, could not administer the oath. No proof is given to shew that he had power, and it is probable from the circumstances, that he had not. I think this objection cannot be sustained.

The principal point is whether the protest is evidence. If it were a new point, I should have no hesitation in rejecting it. I consider the admission of it both dangerous and unnecessary. Dangerous, because there is no cross examination; unnecessary, because the captain, if living, might have been examined in the usual form. But I am bound by former decisions; and after what has passed, I should think it unwarrantable in me to reject the evidence. Inasmuch however as the very point now in dispute has not been expressly decided, viz. whether in an action of replevin, the protest is evidence, I shall be happy if the defendant's counsel will move it in bank, and I therefore consider the point as reserved.

* The defendant's counsel having obtained proof of the unwritten law of *Spain* upon this and other points in the cause, by the testimony of *Louis Moreau Lislet* esquire, an advocate at *New Orleans*, taken under a commission to that city, the reporter hopes that he performs an acceptable service to the professional reader, and at the same time renders a part of the cause more intelligible, by abstracting from the commission the material interrogatories, together with the answers of that gentleman.

courts of *St. Domingo*, and the order of their authorized agent.

The plaintiff in answer to the *first* point denied the *bona fides* altogether; and contended, that if it existed, the *Spanish* law did not give the defendant a right, at the same time deny-

*Interrogatory* 2. Are you conversant in the laws of the kingdom of *Spain* and the colonies thereof? Have you studied and practised, and do you still practise or expound the said laws, in the regular exercise of your profession or office? Is a knowledge of the said laws necessary in order to a due exercise of the legal profession in the territory of *Orleans*, and why?

*Answer.* That he is an advocate practising in the several courts of the territory of *Orleans*, and that he believes that he has acquired some knowledge of the laws of the kingdom and colonies of *Spain*. That it is his duty to give opinions and argue causes depending on the said laws, the knowledge of which is indispensable to those who exercise the profession of an advocate in the courts of this country; because the acts of congress, establishing the provisional government of this territory, have continued the laws which existed here at the time of the cession of the country to the *United States*, in which very little alteration has been hitherto made by the territorial legislature.

*Interrogatory* 3. Is there in the code or system of *Spanish* laws, any law or established doctrine analogous to the *English* common law doctrine of *market overt?* If yea, state what that doctrine is, as clearly, fully and perspicuously as you can. State particularly what are the requisites necessary to constitute a sale in *market overt*, or in the *Spanish* analogous mode: what are the objects or species of property which may be sold in that manner, and what are the effects of such sale. State also how far by the law of *Spain*, the purchaser of movable goods, coming under the description of merchandise, say for instance coffee, sugar and the like, is bound to inquire into the title of his seller, particularly if such seller be a regularly established merchant?

*Answer.* That the principles of the *Spanish* law concerning sales made in a public fair or market (*market overt*) are not absolutely the same with those of the common law of *England*, as far as this deponent is acquainted with them, except with regard to that species of movable property, more particularly known under the name of *merchandise*. That movable property in general cannot be acquired by a sale from a person not being the lawful owner thereof, by virtue of the mere *bona fides* of the purchaser, unless he has had possession so long as to bar the owner by means of the statute of limitations. (See the *law of Partidas. Partida* 3, *title* 29, *Law* 9.) But it appears that for the facility of commerce, an exception has been introduced in favour of sales of *merchandise;* and this deponent verily believes, on the strength of the authorities herein after cited, that a legitimate title, such as a sale or exchange of *mere merchandise* coupled with good faith in the purchaser, is a bar to all claims of the person who should prove himself the lawful owner thereof, saving the recourse of such owner against the one who should have improperly sold his goods. (*Curia Philipica, Book* 1, *Chap.* 7. *No.* 19.) For in the case cited in that work, the

ing that the *Spanish* law was the rule; and 2dly, that the capture having been made more than two leagues from the coast of *St. Domingo*, for the breach of a municipal regulation, the sale not having been ordered by a court of compe-

question turns upon a claim of merchandise marked with the owner's mark, which would seem to support a claim for restitution much more than if the goods were not marked, and of course were more difficult to be identified. And this deponent further declares, that according to the practice and usage of commerce in *Spain* and *New Orleans*, he is informed and believes that he who purchases merchandise, is not bound to inquire whether the seller has or has not a title to, or a right to dispose of, the same, particularly if he purchases them in a fair or market, or of a merchant whose business is to sell similar articles.

*Interrogatory* 4. What are by the *Spanish* law the effects of the sentence of an incompetent court? Is such sentence considered *ipso facto* as a mere nullity, not only between the parties to it, but also as it respects third persons, who *bona fide* purchase property, or otherwise act under it, being ignorant of the defect of jurisdiction? For instance, if a court of justice, regularly established, but mistaking its jurisdictional powers, should in a case in which it was not competent to act, have ordered the sale of goods belonging to an individual, and such property had been sold under the authority of that court in the regular course of its general proceedings, and *bona fide* purchased by a person ignorant of the defects of its jurisdiction, what would be in such case the legal consequence? Does the *Spanish* law make it incumbent on the purchaser to inquire at his peril into the jurisdiction of a court in the particular case? Is the sale considered as a nullity, and can the original owner recover the goods sold, in a suit brought against the purchaser, with or without refunding the money that he paid therefor? Or is the sale considered valid on account of the *bona fides* of the purchaser or otherwise, and the original owner left to his remedy against the party who obtained the judgment of the incompetent court, and procured the goods to be sold by virtue thereof?

*Answer.* In answer to this fourth interrogatory the deponent will merely say, that by the *Spanish* law, a third person who purchases property moveable or immovable at a sale made by judicial authority, is not liable to a suit by him to whom the property belonged at the time of sale, provided the solemnities or formalities required by law for similar sales, have been exactly complied with. (*Curia Philipica, 2d part, § 22, No. 27. Of Executory Judgment.*) That this authority seems to exempt the purchaser of goods sold by judicial authority, from the obligation to inquire into the validity of the judgment by which the sale was ordered, or the competency of the judge who made the decree. That the only duty which the law imposes upon him, is to inquire whether the formalities which have been established for the regularity of judicial sales have been complied with; and now those formalities, by the *Spanish* law, are merely those which are prescribed in the 3d and 6th Laws, Title 27, of the 3d *Partida,* and in

tent authority, and the *res* not being within the dominions of the captor at the time of the condemnation, and never having been within them, the capture, sale and decrees did not devest the plaintiff's property.

*Curia Philipica*, Part 2d, § 22, No. 4. That by the *Spanish* law, the incompetency of the judge is a radical nullity, which vitiates the judgment, and it may be quashed, even without the necessity of an appeal. But the party who will take advantage of that nullity, must not have pleaded to the merits, and must have pleaded in abatement, before *litis contestatio*, otherwise he is considered as having acknowledged the competency of the judge, and to have consented to submit to his decision. See *Partida* 3. *Title* 3. *Law* 9.—*Wood's Institutes, book* 4. *c.* 8. *No.* 3. *p.* 324.—Unless the party should prove that he has acted by mistake, in submitting to the incompetent judge.

*Interrogatory* 5. Suppose a parcel of goods should have been unjustly taken by an individual from another, under some legal color, say of distress for rent or the like; suppose the unjust seizor should sue the owner of those goods, before a court of regularly established jurisdiction, but from some circumstance of locality in the place where the goods were taken, incompetent to decide on the particular case. Suppose that court, either from corruption, ignorance or mistake, should decree the goods to have been legally taken, adjudge them to the seizor, and order them to be sold for his benefit. Suppose the said goods should be sold under that order and purchased by *A* for a valuable consideration. Would the decree of the court be a title to *A*, the purchaser, against the original owner, or would he be obliged to restore them on a suit instituted by the latter against him?—6. What if a third person, ignorant of the circumstances of the case, should *bona fide* purchase the goods in question at second hand, from the one who had purchased them when sold under the order of the incompetent court. Would, by the law of *Spain*, such third person be bound to inquire at his peril into the title of the seller, and into the jurisdiction of the court under whose authority such seller purchased? And would under these circumstances such secondhand purchaser be liable to restore the goods or the value thereof to the original owner, in a suit brought against him by the latter?—7. If such seller at second hand were a merchant, and the said goods were bought of him in his store in the regular course of trade, what would the law be in such case?

*Answer.* This deponent believes that he has already answered the 5th, 6th, and 7th interrogatories.

*Interrogatory* 8. Can you extract from *Spanish* law books of authority in your power or possession, any texts of positive law, or passages from approved authors, confirming, explaining, or elucidating the doctrines by you laid down in your answers to the above interrogatories? If yea, please to extract the same, and annex such extracts upon your oath or affirma-

The Chief Justice charged the jury in substance as fol-
lows: The plaintiff having proved his property, it lies on
the defendant to shew in what manner it has been devested,
and transferred to himself. This he has undertaken to do

tion to your said answers. If, however, you refer to the *digests*, or other
parts of the *corpus juris civilis*, you need not annex the extracts at large,
but only refer to the work itself, by its known divisions of book, title, law
and paragraph.

*Answer.* That the following authorities may be cited in support of the
above answers of this deponent, and that they are exactly extracted or
translated from *Spanish* writers, whose opinions prevail in the *Spanish*
courts, or from the collection of laws published under the name of *Par-
tidas* by king *Alphonso* the Sage, and which (with the compilation of *Castile*)
form the most ancient and most respected code, which exists in *Spain* and
its colonies.

Latin translation of the 9*th Law,* *Title* 29. *Partida* 3. *by Gregorio Lopez.*

How movable goods are acquired by pre-scription.

Movables are prescribed for by three successive years of *bona fide* pos-
session, the possessor believing that the one from whom he purchased had
the power of alienating, and a just title is required. These things concur-
ring, he has acquired a property in the goods, unless the owner will prove
that they have been stolen or taken by force.

### Translation of *Curia Philipica.*

No. 18. If merchandises or other things are marked with the mark of
some person, and that person claims them of a third in whose possession
they are, the third person cannot be obliged to restore them to the plain-
tiff, unless he shall make his right fully appear; such is the opinion of
*Straccha,* with whom agrees *Matienzo* 19. And even if the plaintiff proves
that the merchandises and other things are marked with his mark, and
that he has marked them himself, the third person who is in possession
thereof must be maintained therein, if he proves the title by virtue of which
he has obtained and possesses the same, as by a sale, exchange, or the
like, by reason of the good faith which induces a presumption of the title.

### Another passage of the *Curia Philipica,* 2d *part,* § 22. *No.* 27.

Third purchasers of effects judicially sold.

The person to whom a thing is sold by a public and judicial sale is free
from all claim on the part of the debtor, when the sale has been made
with all legal solemnities, and so say *Salgado, Gutierrez,* &c.

Latin translation of the *Partidas, by Gregorio Lopez; Title* 27th *Partida.* 3*d.*

How execution is to be made.

*Law* 3. When judgment is given for a debt, it must be first executed on
personal chattels, and afterwards, if those are not sufficient, on clear and
manifest credits. No execution is levied on horses, arms, or on the pay of
military men, nor on oxen, except there be not other property sufficient to
satisfy the debt; and if a third person makes opposition to the execution,
affirming that the goods are his, or that he has a right to them, the judge
must decide summarily thereon. If however judgment be given on a thing
certain, execution shall be made thereon.

in two ways. 1. By virtue of a *bona fide* purchase without notice of the plaintiff's claim. 2. By virtue of the orders and decrees of the *French* court of Admiralty, and its agents.

*Law* 5. A final judgment for a debt is to be executed within ten days; and if it is given on a thing certain, execution must be made immediately; and if the defendant shall say without malice that the thing is eloigned, he must give security to deliver it within a certain time, or to pay the value thereof, &c.

*When a judgment for a debt is to be executed.*

*Law* 6. If on a judgment the judge has given the defendant's property in pledge to the plaintiff, he may, if the debt is not paid, expose it to public sale for twenty days, after the expiration of which time, it is to be delivered to the highest bidder, and the residue is to be paid over to the debtor; but if no purchaser can be found, the judge may deliver the pledge to the creditor by way of sale at a fair valuation.

*How goods levied upon must be sold or given in pledge.*

### Translation of *Curia Philipica, 2d part,* § 22. *No.* 4.

A judicial sale must be made at the accustomed place, and in the usual form, and if possible at the place where the thing is situate, so that it may be seen, and its quality and situation ascertained, because otherwise it would not be sufficient to make the sale at the place where the judgment is given, as is said in *Law* 33. *Title* 26. *part* 2., and the commentary thereon. *Glose* 6, and in *Avendano.*

*Interrogatory* 9. Are the principles and doctrines which you have laid down, conformable to the established law in the colonies of *Spain* as well as in the mother country?

*Answer.* The laws and principles above stated are applicable to the *Spanish* colonies as well as to *Spain* proper.

*Interrogatory* 10. Do you know any thing else which can throw light on the points of *Spanish* law in controversy between the parties to the above action? If yea, please to state the same fully and at large, as if you were thereto specially interrogated.

*Answer.* That the deponent knows nothing more that may have any relation to this cause, except that the *Roman* law, is the common law of *Spain,* in all cases which are not provided for by positive or special laws. This deponent must however add the following laws, which he has omitted to quote with the preceding ones.

Latin translation of the *Partidas* by *Gregorio Lopez, Title* 22, *Partida* 3.

*Law* 15. A sentence rendered by an incompetent judge is not valid, even if the parties, believing him to be competent, voluntarily, but through error, litigated before him.

*Nullity of incompetent judgments.*

### *Title* 3, *Partida* 3.

*Law* 9. Dilatory exceptions, as of an agreement not to demand the money within a certain time, or pleas to the jurisdiction, must be pleaded by the defendant before *contestatio litis,* afterwards, he is not to be heard.

*When the plea to the jurisdiction is lost.*

1810.

CRERIOT
v.
FOUSSAT.

1. The title by purchase is founded on the *Spanish* law, of which the defendant has offered evidence. To this the plaintiff objects, in the first place, that the matter is not to be decided by the *Spanish* law, but by the law of the *United States*, of which both plaintiff and defendant are citizens; and he says further that the defendant has not proved the *Spanish* law to be as he alleges. It seems to me that the case must be governed by the *Spanish* law, because the contract for the purchase of the coffee was made within the dominions of *Spain*. It is a general principle that contracts are to be construed according to the law of the country where they are made; and this principle is founded on reason and convenience. It would produce great confusion, if the owner of personal property, fairly acquired according to the laws of the country in which it was situated, should, on its being removed into another country, be devested of it, because he had not acquired it according to the law of the country into which it was removed. It has indeed been decided, that if a contract is made in one country, with a view to *violate* the laws of another, the courts of justice of the country intended to be injured, will afford no relief for the purpose of carrying such contract into effect. A contract, for instance, made in *France* for the sale of goods, with the express purpose of smuggling them into *England*, would receive no countenance from the courts of justice in *England*. This is an exception to the general rule, founded on strong motives of policy. But there is no analogy between that case and the one before us. There is no law or policy of the *United States* or the state of *Pennsylvania*, which is violated, by one of our citizens going to the *West Indies*, and there purchasing goods which have been condemned as prize, and importing them into this country. It is our interest, that property acquired by our citizens in the fair course of trade *abroad*, should be enjoyed without molestation *at home*. No authority has been cited by the plaintiff to warrant this objection, and I am of opinion that it cannot be sustained. We come to the question then, what is the law of *Spain?* On the present occasion, we can only know that law by the evidence which has been produced. The defendant has brought forward the evidence of Mr. *Moreau de Lislet*, who is now a judge of

the parish of *Orleans*, in the territory of *New Orleans*. The plaintiff has remarked, that it is singular the defendant should have rested this matter on the testimony of one man. But it may be remarked in answer, that it is more singular still, that the plaintiff should have produced no testimony at all on this subject. There has been time enough to produce counter evidence, and as this has not been done, and the character of Mr. *Moreau* stands unimpeached either with regard to integrity or legal knowledge, we must suppose that he has spoken the truth. It is his opinion, and he gives the authority on which he founds it, that by the law of *Spain*, a good title to *merchandise* may be acquired, by a purchase made fairly and openly, in the usual course of business, from a person who usually deals in the kind of merchandise thus purchased. If this be the law of *Spain*, it is contrary to our own law, to the law of *France*, of *England* (except the city of *London*, and sales made at fairs and in open market) and to the *Roman* or civil law, which prevails in most countries of *Europe*. Supposing it however to be the law, it is essential to this kind of title, that the purchase be made with perfect good faith, without the least mixture of fraud, collusion, or artifice. To apply it to the point in question. If the agent of the defendant had any knowledge that the coffee had been captured, or if without having certain knowledge he had heard reports on the subject, sufficient to put a prudent man on his guard, he acted at his peril in making the purchase, and must abide by the consequence. But if, without *knowing*, or having reasonable cause to *suspect* the manner in which it had been brought to *St. Jago de Cuba*, he purchased it in the open and usual course of trade, out of the store of a person who was accustomed to deal in that article, I am of opinion that according to the evidence which has been given, the defendant acquired a good title, and the verdict should be in his favour.

2. If the jury should be against the defendant on this point, his second ground of defence is to be considered; the proceedings in the court of Admiralty. The jury will in the first place consider, whether they are satisfied from the evidence, that the capture was made at the distance of more than two leagues from the island of *Hispaniola*. If they are

1810.

CHERIOT
v.
FOUSSAT.

not so satisfied, the decree of the *French* court of Admiralty is supported by the opinion of the Supreme Court of the *United States* in the case of *Hudson* v. *Guestier*, 4 *Cranch.* 293, with which I concur; and the verdict should in that case be for the defendant. The fact, as to distance, depends on the protest of the captain. I submit it to the jury without any remark. It is for them to decide. If they are of opinion, that the capture was at the distance of more than two leagues from the coast of *Hispaniola*, the case is precisely the same as that of *Rose* v. *Himely* decided by the Supreme Court of the *United States*. The opinion of that court was, that the *French* court of Admiralty had no jurisdiction, and consequently no title could be acquired under their orders or decrees. In this decision are involved very important questions, concerning some of which, notwithstanding the great weight of the authority, I cannot say that my mind is fully satisfied. I think it most prudent however to advise the jury, to take the law as laid down in the case of *Rose* v. *Himely*. At the same time, I desire it to be understood, that I take for granted this case will be brought before the court in bank, and that I reserve to myself the liberty of forming my final opinion on more full deliberation than a trial at *Nisi Prius* admits. On this last point then, if the jury should be of opinion, that the capture was at the distance of more than two leagues from the shore, I request them to find for the plaintiff.

The motion for a new trial, together with the reserved points, were argued at last *March* term by *Duponceau* and *Lewis* for the defendant, and by *Condy* and *Rawle* for the plaintiff.

For the defendant, it was contended, 1. That the protest was not evidence in this suit. 2. That this court had no jurisdiction of the cause. 3. That by the law of *Spain*, a *bona fide* purchase of merchandise vests the title, and hence the verdict of the jury was against law. 4. That the verdict was also against law, because the defendant had a valid title under the capture, sale, and condemnation.

1. The first point was argued upon the same ground which was taken at the trial, and has been already noticed. (*a*)

(*a*) See note * supra 227.

2. Upon the second, the argument was in substance this: A court of common law is not competent to try matter of prize, spoliation on the high seas, piracy, or the validity of a foreign sentence of admiralty; nor can it entertain jurisdiction of a case, in which one of these points must be decided. The reason is an obvious one. Cases of this sort always involve the responsibility of governments. They are to be settled according to the law of nations; and they therefore should be tried only in a court proceeding according to that law, and intrusted by its own sovereign with the adjudication of those causes, which uniformly concern the sovereign authority of another nation, and may intimately affect the public relations of the country. Accordingly at an early period, and while the common law courts were very tenacious of their power, it was held by them, that the Admiralty alone could try the question of piracy. *Case of the Admiralty.* (*a*) Upon the same principle a prohibition was refused to stay a suit in the Admiralty against the vendee of goods piratically taken at sea; *Anon. Cro. Eliz.* 685; and the reason given for it in *Pelagi's case,* (*b*) where a like application was refused, was, that if granted, there would be no remedy for the owner, who could not proceed in a court of common law. Whether piracy or not, may depend upon the validity of the commission under which the capture is made; and whether valid or not, is a question which a municipal court is not competent to decide, so as to affect the question of property growing out of it. In like manner a prohibition to the Admiralty was denied, solely on account of the question of prize, notwithstanding the plaintiff in prohibition shewed, that the captor and the ship taken, both belonged to *England,* and of course the taking was a mere trespass. *Tompson* v. *Smith.* (*c*) It is of no consequence that the matter attempted to be tried in the common law court, is not the direct question of prize between the captor and captured. If it is a controversy between other parties depending upon the question of prize, or involving the validity of a sentence of Admiralty, *Radley* v. *Egglesfield;* (*d*) if the principal matter is a taking at sea, though at the same

1810.

CHERIOT
v.
FOUSSAT.

(*a*) 13 *Co.* 52.　　　(*c*) 1 *Sid.* 320.
(*b*) 3 *Bulstr.* 29.　　(*d*) 2 *Saund.* 259.

1810.

Cheriot
*v*
Foussat,

time, the immediate foundation of the rights of one party is a transaction on land; *The King* v. *Broom,* (a) *Tompson* v. *Smith;* if the injury done, or the claim set up, is one of the consequences or incidents of a taking as prize, *Le Caux* v. *Eden* (b), *Doane's Adm'rs* v. *Penhallow* (c), *Ross et al.* v. *Rittenhouse* (d), *Smart* v. *Wolfe* (e), the question is exclusively triable in the Admiralty, according to the law of nations, and not in a court which proceeds according to the rules of the common law. Indeed so far has this jurisdiction of the Admiralty been respected, that in *Vanderwoodst* v. *Thompson* cited by *Buller* J. in *Le Caux* v. *Eden,* it was held that an action would not lie in the common law court for a trespass in entering the plaintiff's ship on the high seas and taking his goods, because there was reason to suppose, as was said by *Gould* justice, that the ship was a pirate. It is essential that questions of this description should be subjected to the decision of some forum, governed by the same rules in all countries; and it is worthy of remark, that in the celebrated answer to the *Prussian* memorial, *Great Britain* justified the reprisals she had issued against *Spain* on account of captures at sea, partly upon the ground that those captures were judged of in revenue courts, and not in courts of Admiralty according to the law of nations. 1 *Magens* 506. In the present case the taking was as prize. The court at *St. Domingo,* upon the face of the decree, proceeded as a prize-court, though it also had instance jurisdiction. The court of appeal is styled " the special commission of appeal *in mat-* " *ters of prize;*" and the schooner *Mars* and cargo were condemned *as prize,* and ordered to be distributed according to the ordinance of 1681, which has a title on prizes of war, and no other. It is impossible to hold plea of this suit without examining the proceedings of a court claiming to be a prize-court, or without directly deciding the question of prize or no prize, against all the authorities cited. Judge *Washington,* in *Snell* v. *Foussat,* was of opinion that the District Court alone had jurisdiction; but owing to a compromise, the point was not finally decided in the Supreme Court, Indeed in none of the analogous cases, which originated on the common law side of the Circuit Court, and were after-

(a) 12 *Mod.* 134,　　(c) 1 *Dall.* 218.　　(e) 3 *D.* and *E.* 328,
(b) *Doug.* 573.　　(d) 2 *Dall,* 160.

wards carried to the Supreme Court, was the point so made as to obtain a decision.(*)

3. The law of *Spain* was the rule of the contract made by the defendant's supercargo with the possessors of the coffee at *St. Jago*. It is not merely upon the question of construction that this law may be cited, but also upon the

(*) SNELL
v.
FOUSSAT.

By the notes of judge *Washington*, with a copy of which the reporter has been favoured, the case was thus:

" It was *Trover* for a quantity of coffee. The case stated by the plaintiff, was, that the *Charlotte*, being his property, took in at *Cape Francois* in 1803, a quantity of coffee for the plaintiff, and some for other shippers; and while on her return to *New York*, was captured by a *British* frigate, part of her hands taken out, a prizemaster put on board, and ordered for *Jamaica*. After being in possession of the *British* prizemaster for some days, she was captured by a *French* privateer, and carried into *St. Jago de Cuba*. Having lain there for a short time, her cargo, or a part of it, was transshipped into a vessel called the *Messenger*, brought to *Philadelphia*, and came to the possession of the defendant, who on demand by the plaintiff refused to deliver it up, saying it had been purchased at *Cuba* for him by his supercargo."

" The defence was *first*, that the evidence adduced by the plaintiff, did not shew his property in the coffee delivered to the defendant; that the marks of the barrels and bags, as entered at the *Customhouse* here, did not correspond with those put on them at *St. Domingo*, and therefore that if the coffee taken in by the schooner *Messenger* at *Cuba* was proved to have come from the *Charlotte*, yet it might as well be the coffee of the other shippers as of the plaintiff, and if so, a recovery in this action would be no bar to an action by those persons.

*Second.* That by an arrêté of *General de Noailles*, general of brigade, commander in chief of the right northern division of the army of *St. Domingo*, dated the 6th of *November* 1803, a council of prizes was established for *Cape St. Nicholas Mole*, who on the 30th *November* 1803, in consequence of a report made by their officer on the 29th, that the *Charlotte* was cleared from the Cape for *New York*, and was captured and recaptured as before, that he is positive she was first detained and afterwards condemned by the captain of the *British* frigate, that it is evident she was a prize to the *English*, and was found with an *English* prizemaster on board, and concluding by stating as the result of all this that she and her cargo ought to be considered as *English* property, and ought to be condemned, did condemn the vessel and cargo as good prize taken from the *British*, and ordered her to be sold for the benefit of the captors. The vessel lay at *St. Jago* at the time of the condemnation, the transshipment into the *Messenger* took place on the 5th of *November*, and she was entered at *Philadelphia* on the 5th of *December*."

" The counsel contended, on these facts, that the condemnation was conclusive as to the property; that the vessel being in a *Spanish* port was no objection; that *prima facie*, this court must presume the court to be an

1810.

CHERIOT
*v.*
FOUSSAT.

question of validity. If the contract is valid by the law of the country where it is made, it is so in all countries, unless it is made with intent to violate the law of another country, in which case the courts of that country will not aid it. *Robinson* v. *Bland.* (a) And although the contract may be void

authorized tribunal; and that it was no objection to the condemnation, that the cargo was previously sold. Cases cited on this point: 3 *Rob. Rep.* 269., *Bynk. b.* 1. *ch.* 15., *Vat. p.* 515. *b.* 3. *s.* 132., 1 *vol. Corp. de Pr. s.* 370., *Mart.* 45., *Lampredi, p.* 183., 2 *Ruth.* 594., 4 *Rob.* 57., 3 *T. Rep.* 192.

" *Third.* If all this was against the defendant, yet he was a bonâ fide purchaser, and according to the correct opinions of civilians, the plaintiff, if he recovered, ought to pay the amount of what the coffee cost, or what it was reasonable to think the plaintiff would have given for the release of the property. That fraud, according to the understanding of civilians, consisted in combination and secrecy, benefit to ourselves, and injury to others. On these points: 2 *Kaimes c.* 9. 391. 390., 2 *Cochin* 708., *Grot.* 1 *vol.* 395., *Puff.* 451., 1 *Ruth.* 135. *Case of the Neptune before the Dist. Ct. of Pennsa.*

" On the other side were cited: 2 *Vat.* 272., *Martens* 105., *Peak's Ev.* 47, 48., 1 *Rob. Rep.* 119. 135., 2 *Rob.* 2. 9., 4 *Rob.* 35., 3 *Rob.* 192. 53. 83.

" The defendant moved to nonsuit the plaintiff, upon the ground that this being a cause dependent on the question of prize or no prize, it belonged exclusively to the district court. *Cases cited:* 3 *T. Rep.* 341., *Cro. El.* 685., 13 *Co. Rep.* 52., 3 *Bulstrode* 27., 1 *Sid.* 320., 2 *Lev.* 25., 2 *Saund.* 359., 12 *Mod.* 134., *Carth.* 423. 474., *Dougl.* 572., 3 *T. Rep.* 333., 3 *Dall. Glass and Gibbs.*, 2 *Dal.* 165., 1 *Dal.* 218., *Mart.* 100., *Dougl.* 592., 2 *Brown A. L.* 213., 2 *Rob. Rep.* 198., 3 *Rob. Rep.* 82.

" On the other side were cited: *Comb.* 120., *Carth.* 31., 3 *Keb.* 297, 360, 364., 1 *Lev.* 243., 12 *Mod.* 16, 143., 1 *Hen. Black. app.* 51, 52., *The Span. Treaty* 6. *art.*, 2 *vol. U. S. Laws* 516., 1 *Dal.* 95., 2 *Dal.* 4., 3 *Dal.* 333., 2 *Wood. Sec.* 451. 454., 2 *Burr.* 685. 1209., 10 *Mod.* 510., 4 *Rob.* 232. 240., 2 *Dal.* 81.

" Upon the motion for a nonsuit the court was divided. Judge *Peters* thought we had jurisdiction, I was of a different opinion. No reasons were given. But those which governed me were shortly as follows: The *Charlotte* was captured by the *English* frigate as prize, was recaptured by the *French* privateer as prize, sent into *Cuba* and afterwards condemned. The plaintiff at the time of the capture had an indisputable title to the property in question, if it is identified. But if it was lawfully seized and condemned, the right of the plaintiff was devested. The very question in issue, therefore is, whether the property in dispute was captured as prize, and lawfully condemned so as by the law of nations to change the property. The question, therefore, of prize or no prize, is the very gist of this action; and all the cases from the earliest period prove that such a question as well as the consequences of it, belong exclusively to the court of prize, and in this country to the District Court."

WASHINGTON, Justice, charged the jury.

" This is an action of trover and conversion, the ground of which is property in the plaintiff in the goods claimed, and a conversion by the de-

(*a*). 1 *W. Black.* 256.

by the law of the country where sued, it does not exempt
the party who impugns it, from the necessity of shewing as
a fact that it is void in the country where made. *Male* v.
*Roberts.* (*a*) The *lex loci* applies emphatically to contracts
of sale. As it is said by the court in *Grant* v. *M'Lachlin*
(*b*), " a sale according to the law of the place where the
" property is, must vest a title in the purchaser, which all
" foreign courts are bound, not only from comity, but on

fendant. The evidence to establish the right of the plaintiff to the goods
brought in the *Messenger* and delivered to the defendant, is very contra-
dictory. It is essential to the plaintiff's recovery, that he should satisfy
you upon this point. It appears that other coffee than that belonging to
the plaintiff was shipped from the *Cape.* That the marks upon the pack-
ages of the plaintiff's coffee were different from those which appeared on
the packages entered at the customhouse at *Philadelphia.* It therefore
becomes highly important that you should carefully examine the evidence,
and unless you are satisfied that the plaintiff has established his right of
property in the very coffee delivered to the defendant, your verdict must
be for the defendant. But if you should be of opinion that the plaintiff
has proved his right to that identical coffee delivered to the defendant,
then we are of opinion that the condemnation at the *Mole* did not affect
it. A condemnation of neutral property, by an unauthorized tribunal, is
not to be regarded by the courts of other nations. It is contended that
*prima facie,* the council of prizes at the *Mole* is to be considered as a le-
gitimate court. I admit that where we find a condemnation by a foreign
court, of the origin of which we are not informed, we ought to presume
it a legitimate tribunal. But when the source of its authority and consti-
tution is stated, we ought to examine it, and if it be contrary to the usual
mode of constituting courts, it shifts the burthen of proof upon the party
who would support the condemnation, particularly as it is more easy to
prove the legitimacy of the court, than to disprove it. We know that the
appointment of courts is in all civilized countries, by the sovereign power.
This power may be lodged by the sovereign in a subordinate civil officer;
nay in a military commander, if the sovereign so choose. But this latter
mode is so unusual, that when we hear of a court being constituted by a
military commander, and particularly where it is not clear that he was at
the time commander in chief, it destroys the presumption of its legality,
so as to require the party who would support the condemnation, to shew
that the court was instituted by lawful authority."

" The court being agreed upon this point, we think it unnecessary to
decide the other objections to this sentence."

The jury found for the plaintiff.

(*a*) 3 *Esp.* 163.          (*b*) 4 *Johnson* 40.

1810.

CHERIOT
v.
FOUSSAT.

"strong grounds of public utility, to recognise. Without "this rule, there could be no safety in derivative titles." Sir *Wm. Scott*, in the case of the *Helena*, (a) carries this principle to the extent of protecting the *bona fide* purchaser of an *English* ship captured by an *Algerine* corsair, and sold by the Dey without any judicial proceeding whatever. He presumed the sale was made regularly *in their way*. The testimony of Judge *Moreau*, and the citation from the *Curia Philipica*, shew that a *bona fide* purchase of merchandise from a person who deals in the article, vests a title by the law of *Spain;* and the evidence of the defendant's supercargo establishes the good faith, and the fact of purchase from merchants in the regular way of business. The jury have made rash presumptions of the supercargo's knowledge, from his being at *St. Jago* when the *Mars* arrived, from the population of that city, and from its being a place of rendezvous for *French* prizes. They have found against evidence as well as law.

4. The defendant has a title under the capture, sale, and condemnation, which cannot be defeated, if the court of *Santo Domingo* had jurisdiction; for where the proceeding is in *rem*, it never has been questioned that all the world are bound as to the property in the *res*, provided the court has authority to decide upon the case. What then are the objections to the jurisdiction? 1. That the *Mars* and her cargo were never within the dominions of *France*. It is not necessary that they should have been, by the law and practice of nations; of *France* since the year 1665, of *England* since the time of king *William*. As early as 9 *W*. 3., a vessel captured and carried into a river on the coast of *Africa*, was condemned in the Admiralty of *England*, and effect was given to the condemnation by the Kings Bench. *The King* v. *Broom*. (b) In 1745 the *English* Vice-Admiralty at *Gibraltar* held plea of a prize taken by an *English* privateer, and carried into *Lisbon*, a neutral port, where she then lay. *Pond* v. *King*. (c) Sir *William Scott*, while advocate-general, argued in the case of *Smart* v. *Wolfe*, (d) that by the capture

(a) 4 *Rob.* 4.          (c) 1 *Wils.* 191.
(b) 12 *Mod.* 134.        (d) 3 *D. & E.* 329.

the thing was acquired to the state, and though put into the hands of the captors, remained in contemplation of law in the custody of the public; and that the Admiralty had therefore jurisdiction of the subject, wherever the thing might be in the possession of the captors or their agents. In confirmation of the doctrine he mentioned several cases, in which the Admiralty exercised this jurisdiction, although the thing was either sold, or situated in a neutral country, particularly the case of the *Buoen Consago*, an *English* prize taken into *Lisbon*, and condemned in *England*. In the case of *The Herstelder*, (*a*) however, he for the first time expressed dissatisfaction at the practice, and said he would not condemn a vessel lying in a neutral port; and in the *Flad Oyen*, (*b*) though he admitted there had been some cases of condemnations in *England* of *British* prizes carried into *Lisbon* and *Leghorn*, he said the infrequency shewed the irregularity of them, and he endeavoured to justify these cases by treaties, which had given to *Lisbon* and *Leghorn* the character of *British* ports. But finally he was compelled to return to his first opinion; for in *The Henrick and Maria*, (*c*) where the point was directly in question, and was fully investigated, he referred to a vast number of cases in which the practice had been followed, and although he argued against it, said it was too inveterate for him to shake. His judgment was affirmed in the court of appeals, (*d*) where it was shewn to have been the practice in the war of 1756; it was followed in the case of *La Dame Cecile* (*e*) in 1806; it has the complete sanction of most if not all the nations in *Europe*; and has been recognised by the highest judicature of our own country in the case of *Hudson* v. *Guestier*. (*f*) The sale before condemnation does not alter the case; since the vendor was the authorized agent of prizes, and the vendee was his representative until condemnation, which confirmed all the preceding acts. 2. Another objection is, that the seizure was made, according to the captain's protest, more than two leagues from shore, which is supposed to have been the jurisdictional limit of seizure, according to the arrêté of

(*a*) 1 *Rob*. 100.  (*c*) 4 *Rob*. 35.  (*e*) 6 *Rob*. 257.
(*b*) 1 *Rob*. 119.  (*d*) 6 *Rob*. 138.  (*f*) 4 *Cranch*. 293.

1810.

CHERIOT
v.
FOUSSAT.

the 1st *March* 1804. This however is a plain misconstruc-tion of the arrêté; for the circumstance of being within two leagues of the coast, is the offence, and not a limitation of the place of seizure. After it is committed, it may be punished by seizure any where upon the high seas, the common jurisdiction of nations. The offence alleged against the *Mars*, was her communication with the brigands, not that she had been found within a certain distance of the coast. But sup-posing the place of seizure to be material, the sentence is conclusive upon the point, that the seizure was duly made. Every thing constituting the validity of a prize, is within the cognisance of a prize-court; and therefore to say that the prize is not valid because the seizure was not made in the right place, is to open a door for the revision of the sentence in all its parts. The lawfulness of the capture as to locality, is as much within the jurisdiction of a prize-court, as its lawfulness for any other cause. It is a point which has been directly decided by the court at *Santo Domingo*. But in reply to this it is said, that the law was a municipal law only, and that for breaches of municipal law there can be no seizure *extra territorium;* of course, that this fact is connected with the question of jurisdiction. It cannot be called a municipal law, solely, because it was made in execution of a belligerent right, and the aggressors against it were threatened with punishment for violating the laws of nations. If however it was, what shall prevent a nation from punishing the violation of her municipal laws, by a seizure on the ocean? She invades the territory of no other nation; but on the contrary is on that highway which is common to all, and where she is therefore as free to act as upon that which is separately her own. Accordingly all nations authorize seizures beyond the marine league, in vindication of munici-cipal laws. *Great Britain* by her hovering acts directs them at a distance of more than four leagues, if the offender has been within four. 24 *G. 3. c. 47.*, 10 and 11 *W. 3. c. 10.* The *United States* authorize their revenue-cutters to board ves-sels any where within four leagues of the coast. 1 *U. S. Laws* 236. *Great Britain* took all vessels coming to this country during the revolutionary war; and the *United States* seize on the high seas all vessels of their own citizens vio-

lating the laws of non-intercourse. It is the law and practice of nations, and is not to be disturbed. The case of *Rose* v. *Himely* (a) is not an authority for the position that the place of seizure is material. A majority of the five judges who ruled that case, went upon the ground that the property had never been taken within the dominions of the captor; and this opinion being overruled in the case of *Hudson* v. *Guestier*, (b) which was argued at the same time, that cause was remanded to the Circuit Court, where it was again tried, and the jury instructed that the distance from the shore at which the seizure was made was wholly immaterial; and a bill of exceptions having been taken to this opinion, it was carried to the Supreme Court, where the judgment was affirmed at the last term. So that *Rose* v. *Himely* has been overruled throughout.

For the plaintiff, the argument upon the competency of the protest was the same as at *Nisi Prius.*

2. Upon the second point, the jurisdiction of this court, it was argued that unless the jurisdiction was sustained, the plaintiff was without remedy. The question of prize or no prize is not triable in the Admiralty, more than in a court of common law. It is triable only in the prize-court, which acts by special commission, is the court of an actual belligerent to try the validity of its own captures, and exists only in time of war. *Lindo* v. *Rodney.* (c) As to the subject matter, courts of admiralty and of common law have a coextensive jurisdiction. A prize-court differs from both as to the subject, and draws to itself the exclusive consideration of captures in right of war. But the *United States* have no such court. The District Court has jurisdiction as a court of Admiralty, but not as a court of prize; and if we can try the present question only in a court of prize, there is no forum for the trial of the case in this country. This however cannot be. It would expose our citizens to the grossest wrongs. As a neutral we never can have a prize-court to try the validity of *British* or *French* captures. We never can require

(a) 4 *Cranch.* 241.　　(b) 4 *Cranch.* 293.　　(c) *Doug.* 591. *note.*

1810.

CHERIOT
v.
FOUSSAT.

it, because we capture nothing, and there cannot be made any captures of our property, *jure belli*. Every question of property in our country between our own citizens, must be triable in our courts of Admiralty, or in those of common law; and the utmost extent to which the cases of the defendant go, is, that where the cause arises at sea, the Admiralty has a concurrent jurisdiction, and will not be prohibited. This is not a question of prize. Prize is a taking by right of war in a state of war. *Bass* v. *Tingey.* (*a*) The very term implies it. Whether the right be well founded or not, the prize must at last be taken by an *asserted* right of war. But here there is nothing of that kind. There was no war between *France* and the *United States;* there could be none between *France* and her revolted subjects. The taking was by an asserted right of commercial regulation, of which a common law court is perfectly competent to judge. It is not sufficient to oust this court of its jurisdiction, to allege a taking as prize. The possession of the captor may amount to a mere trespass, although the original taking has been as prize; for by delay to procure a condemnation, the captor may prove that the suggestion of prize is a pretence. It must be shewn to have been a taking *jure belli*, and prosecuted as such.

3. It was left to the jury upon the third point, to say whether there was good faith in the defendant; and their verdict has found that there was not, which puts an end to the question of law. They were intitled to infer this from the evidence. But if there was good faith, it is not conceded that the law of *Spain* gives a title to the purchaser of merchandise, by reason of mere *bona fides*. The civil or *Roman* law is stated to be the law of *Spain*. By that law the buyer becomes the master of the article, only in case the seller is the right owner of it. 1 *Domat.* 61. *Nemo plus juris in alium transferre potest, quam ipse habet.* 1 *Pothier Contr. de Vente* 8. It does not acknowledge any thing like market overt; and the only authority for an exception in favour of merchandise, the *Curia Philipica*, goes no further than to say, that goods are presumed to belong to a person whose marks they bear,

(*a*) 4 *Dall.* 44.

but that this is not conclusive; and that there is a presumption of title in favour of a person who has bought *bona fide*, but which of course may be rebutted. This however is not a case of contract in which the *lex loci* prevails. That applies only between the contracting parties, by virtue of their consent. But the plaintiff never consented to the *Spanish* law. He was plundered by force; and if that force was unlawful, no title could grow out of it.

4. The proceedings and condemnation have not devested the plaintiff's property, because the *French* court wanted jurisdiction for the following reasons: 1. The court acted on its instance side for the breach of a municipal law, and its jurisdiction therefore depended upon a seizure within the reach of the municipal authority; but the seizure was on the high seas. 2. The proceedings and the sentence were *ex parte*, fraudulent, and void, the thing taken never having been within the dominions of the captor, but having been at the time of condemnation within the country of the captured. 1. It is plain from all the arrêtés, and also from the notification of Mr. *Pichon*, that *France* conceived herself to be in the exercise of a territorial right, when she interdicted commerce with the blacks of *St. Domingo*. She uniformly speaks of them as revolted subjects, never as enemies. She punishes those who prosecute the trade she inhibits, by confiscating their property, not by seizing it as prize of war. She had no right in her belligerent character to interdict trade with *St. Domingo*, except to blockaded places, and in contraband of war. She had an unquestionable right as the sovereign of the island, to punish the least intercourse with any part of it. It is therefore in opposition to the obvious intent of *France*, if the proceeding in question is treated in any other character than a seizure under a municipal law, and a condemnation in a municipal court, to punish the violation of territorial rights. It follows that the jurisdiction of the court was of a municipal character, which depended wholly upon the seizure's being such as a municipal law will warrant, that is, a seizure within the territory of the sovereign; and it having been made where the law had no authority, where the sovereign had no territorial rights, it was illegal, and could not

1810.

CHERIOT
*v.*
FOUSSAT.

1810.

CHERIOT
v.
FOUSSAT.

give jurisdiction. There can be no doubt upon the principles of public law, that the statutes of a country have no extraterritorial force. 2 *Kaime's Prin. Eq.* 352, 354. Her penal statutes are peculiarly local, and affect nothing which cannot be seized within their influence. *Folliot* v. *Ogden.* (a) Courts to whom the vindication of those laws is confided, have a jurisdiction only coextensive with the law; and hence every act of jurisdiction beyond the territory is absolutely null. 1 *Erskine's Inst. book* 1. *tit.* ii. 23. *Kaime's Hist. Law Tracts* 232. *France* herself claimed a jurisdiction only within the two leagues, and those who claim under her cannot assert a more extensive one. If the jurisdiction on the high seas is common to all nations, it is against the right of any nation at peace to seize her subjects there. The instant the territorial limit is passed, territorial offences are left behind, and the offender comes under the protection of his own country; he becomes, as it were, a part of it, and it is against the equality of nations to molest him. The jurisdiction thus depending upon the place of seizure, that fact must be examined. If it does not appear, it may be, and according to the decision of the Supreme Court, (b) it *must* be shewn by evidence; and if shewn that the seizure was beyond the territory, as it was here, it amounts only to a marine trespass, and confers no jurisdiction. *Rose* v. *Himely.* (c) 2. But the court also wanted jurisdiction, because the property was never carried into the dominions of *France*, and the proceedings were wholly *ex parte*, and in fraud of the plaintiff. However the practice may have been in *England*, certainly nothing of that sort can deter us from adopting the true principle in relation to the jurisdiction of prize courts. There has been no practice in this country; nor has there been any binding decision upon the point. The case of *Hudson* v. *Guestier* was ruled only by five judges, and in *Rose* v. *Himely*, Judges *Cushing, Chase*, and *Livingston* were of the opposite opinion. It was the absence of Judge *Cushing* in *Hudson* v. *Guestier*, that gave a majority upon the question, when in fact the court was equally divided; and this court may therefore pursue their own judgments without restraint. No one can read the argument of

(a) 1 *H. Black.* 123.    (b) 4 *Cranch.* 298.    (c) 4 *Cranch.* 279.

counsel and court in the case of the *Henrick & Maria*, without seeing, that the practice is repugnant to all the laws of war, and in fact to all the principles upon which prize jurisdiction is founded. It converts a neutral country into a belligerent station, contrary to the laws of neutrality; and would, during the present contest, disgrace *America* by making her a *French* warehouse. Although the proceeding is *in rem*, the *res*, which alone gives jurisdiction, is never within the power of the court. The court cannot restore it, if there shall be an acquittal, and it cannot by its own process inforce condemnation. The owner and his agents who are intitled to be either parties or witnesses, are carried away; so that in relation to them, the fiction of their presence in the Admiralty is a solemn farce. And in fine, the practical principle of prize jurisdiction, the actual hostile possession by force, is exchanged for a mere constructive, ideal, representative possession, by a captor, or his agent, or neutral vendee, so that with as much safety to both belligerents and neutrals, a condemnation might pass, where there was in fact no capture at all. It was the view of these consequences that induced the Supreme Court of *New York* in *Wheelwright* v. *Depeyster*, (a) to decide, in direct opposition to the defendant's rule, that a prize-court cannot adjudicate on a prize lying in a foreign port, or out of the jurisdiction of the captor or his ally; it also led to the strong doubt expressed by this court in *Duncanson* v. *Maclure*. (b) There is no safety to neutral property, under the principle contended by the defendant. In the present case it was used as an instrument in the perpetration of a gross fraud. A sentence was not thought of until the replevin by the plaintiff. It was then fabricated to cover a defective title, without notice to any one on behalf of the owner, and therefore in open violation of the first principles of natural justice. Fraud vitiates every thing, even the sentence of a court having jurisdiction; and in this case fraud is the basis upon which the jurisdiction is claimed, and upon which alone it can be supported.

*Cur. adv. vult.*

(a) 1 *Johns.* 470.      (b) 4 *Dall.* 314.

CHERIOT
*v.*
FOUSSAT.

The Judges now delivered their opinions.

TILGHMAN C. J. This is an action of replevin for a quantity of coffee, and cotton, which having been shipped from *Jeremie*, a port in the island of *St. Domingo*, in possession of the revolted negroes, was captured by two *French* privateers, and carried to *St. Jago de Cuba*, in the island of *Cuba*. It was there purchased by the defendant, and brought to *Philadelphia*, where being discovered by the plaintiff the original owner, this suit was brought. The defendant supports his claim to the property, under a decree of condemnation by the court of the *French* republic at *Santo Domingo*, and an order of sale, by *John Baptist Audibert*, styling himself " commissary of marine, *French* agent in the island of *Cuba*, " authorized to make the preparatory proceedings in mat- " ters of prize in this island."

On the trial of this cause, the plaintiff's counsel contended, that the *French* court had no jurisdiction, and therefore its proceedings were void; and they relied on the case of *Rose* v. *Himely*, 4 *Cranch*. 241, in the Supreme Court of the *United States*, as directly in point. My respect for that court, forbade me to dissent hastily from its decision, in a case, confessed by all to be important and difficult. I therefore requested the jury to find for the plaintiff. But at the same time I declared, that the case of *Rose* v. *Himely* involved questions, concerning some of which, notwithstanding the great weight of the authority, my mind was by no means satisfied; and I desired it to be understood, that I expected this cause would be brought before the court in bank, where I might have an opportunity of forming a final opinion, after full argument.

If the *French* court decided on a subject within its jurisdiction, the plaintiff cannot recover, for we have no right to inquire into the correctness of that decision. How then does this matter of jurisdiction stand? But a previous question is made. Has this court a right to inquire into the jurisdiction of the court of another nation? The general principle is, that what has been decided by a court of competent jurisdiction in one nation, shall not be questioned in the court of another. This would seem to leave the question of compe-

tency open. And there is strong reason why that question should be open; for otherwise we should be subject to the greatest abuse. A person might style himself a judge, without any authority from the government under which he professes to act. A case of this kind has actually happened, and was brought before the Circuit Court of the *United States* for the *Pennsylvania* district. The late Mr. *Noailles*, on his passage from *St. Domingo* to the island of *Cuba*, undertook to erect a prize-court. One of the decrees of that court was brought into question in the case of *Snell* v. *Foussat*. The jurisdiction was inquired into, and found to be without authority from the *French* government. The Circuit Court therefore declared the decree to be void. But even where the authority of the court has clearly emanated from the sovereign power of the 'nation, it is going too far to say, that its jurisdiction cannot be questioned. All nations are on an equality. If any one then, should undertake to erect a jurisdiction in manifest violation of justice, general convenience and long established principles, is this to be submitted to? Suppose a belligerent should direct his officers to hold prize-court, within the dominions of a neutral, without that neutral's consent, can it be doubted, whether the jurisdiction of such a court may be called into question? But it is answered that it is the business of *government*, and not of *courts* of *justice* to seek redress in case of these irregular acts of sovereigns. This answer does not appear satisfactory. Government may certainly interfere with great propriety. But what are the courts *to do*, when the subject is brought before them in the course of the administration of justice? They cannot refuse to decide, and have no rule to govern their decisions but the law of nations. We know very well that the *English* courts make such inquiries, and have decided, that decrees under the authority of a belligerent, within the dominions of a neutral, are of no validity. I have frequently known the jurisdiction of *foreign* courts inquired into in this court, and particularly in the case of *Duncanson* v. *Maclure*, where the ship *Mount Vernon* was condemned by a *French* court in *St. Domingo*, while she was lying in the *Spanish* island of *Porto Rico*. That case was very much contested, but I think our right to inquire into the jurisdiction of the *French*

court was not denied. So also in the cases of *Rose* v. *Hime-ly*, and *Hudson* v. *Guestier* in the Supreme Court of the *United States*, the jurisdiction of the foreign court was inquired into. I conclude therefore that we may inquire into the jurisdiction.

The clearest manner of inquiring into the jurisdiction of the *French* court, will be, to consider the objections that have been made to it. These objections may be reduced to the following heads.

1. The arrêté under which the court proceeded, was a penal municipal law.

2. A municipal law cannot be inforced *extra territorium*.

3. The seizure was without the territorial limits of the *French* republic.

4. The property condemned was never brought within the *French* territory.

1. The nature of the arrêté is to be collected from its words, and from the circumstances of the island of *St. Domingo*, before and at the time of making it.

For a considerable time before the making of this arrêté, there was war between the *French* republic, and the negroes of *St. Domingo;* and the *French* were driven out of possession of the principal part of the island. The revolted negroes were considered by the *French* government as rebels, and it had been officially notified by their minister in the *United States*, that all persons carrying on trade or maintaining an intercourse with the inhabitants of *St. Domingo*, contrary to the ordinances of the *French* government, should be punished as violaters of the *rights of the French republic, and the law of nations*. The government of the *United States* has taken no part between the contending parties. It has never acknowledged the independence of the revolters. We are not at liberty therefore to consider the island in any other light, than as part of the dominions of the *French* republic. But supposing it to be so, the republic is possessed of *belligerent* rights, which may be exercised against *neutral* nations, who carry on commerce with the revolters. This is not denied; but it is said that the words of the arrêté prove, that there was no intention to exercise such rights. This argument is not conclusive.

Although the *French* government from motives of policy, might not choose to make mention of war, yet it does not follow, that it might not avail itself of all rights to which by the law of nations it was intitled in the existing circumstances, under the form of a law made for the regulation of the trade and commerce of one of its colonies. This was the course pursued by *Great Britain* in the revolutionary war with the *United States*, and it has not been supposed that she violated the law of nations, when she captured and confiscated the vessels of neutrals, who carried on trade with the *United States*, in whatever part of the ocean they were found by her ships of war and cruisers.

The *French* court of Admiralty founded its decree of condemnation on the fourth article of the arrêté of 9th *October* 1802, and the first article of the arrêté of 1st *March* 1804. By the former it is declared, that " every coasting or " other vessel, communicating with the points of the coast " occupied by the rebels, shall be seized, and the vessel and " cargo shall be confiscated." The latter is intitled, " An " arrêté relative to vessels taken in contravention of the dis- " positions of the laws and regulations concerning *French* " and foreign commerce in the colony;" and is in the following words. [Here the Chief Justice read the arrêté.] Considering the words of this last arrêté, and the circumstances under which it was made, it ought not to be understood simply as a municipal regulation, but a municipal regulation connected with a state of war with revolted subjects; and in inforcing it, the republic might avail itself of all rights, which are given by the law of nations to a government thus circumstanced.

2. If this view of the subject be correct, the second objection falls to the ground, for it is founded on the supposition that the law is purely municipal. When it is said that this law cannot be inforced, *extra territorium*, I presume it is meant, that it cannot be inforced on the ocean, at a greater distance than two leagues from the *French* coast. The reason assigned is, that the ocean is common to all nations. If it was not common to all, but the right of one, the reason would be conclusive. But if it is common, why may not any nation make a seizure on it, for a breach of a municipal

law? Whose right is invaded by such seizure? The *United States* have authorized the capture of their own citizens on the ocean, for the breach of their municipal laws. The *United States* would not pretend to pursue their own citizens, within the territory of any other power. It seems then, that the ocean being common to all nations, no one has a right to complain, if it is used for the purpose of capture for breach of any law. Yet as this is a point of very great importance, although I have expressed the present inclination of my mind, I will not give a decided opinion on it. I think it unnecessary, because I am satisfied that the arrêté under consideration, ought not to be taken as a law purely municipal.

3. The third objection is founded on the words of the arrêté of the 1st *March* 1804. It is supposed, that the seizure is restricted to the distance of two leagues from the coast of *St. Domingo.* But I am not satisfied of the correctness of that construction. The description of vessels " *cleared* " *from, or bound to,* the ports in the possession of the rebels," seems to be independent of, and not included in the subsequent general description of " all vessels under sail in the " territorial extent of the island, found at a distance of less " than two leagues of the coast." It appears that Chief Justice *Marshall* was furnished with an imperfect translation of the arrêté, when he delivered his opinion in *Rose* v. *Himely;* perhaps his opinion of its construction would have been different, had the translation been correct. But even if the seizure was restricted to the distance of two leagues from the coast, how would the jurisdiction of the *French* court be affected by it? It is not a court instituted only for the trial of captures within two leagues of the coast, but a court of general jurisdiction, styled " the provisional com- " mission of justice established at *Santo Domingo*, judging " in the first instance, in matters of prize, by virtue of the " arrêté of the consuls of the republic of the 4th *October* " 1802, on the capture of vessels found acting in contraven- " tion of the laws and regulations concerning the *French* " and foreign commerce in the *French* colony of *St. Do-* " *mingo.*" When a vessel is libelled in this court, a breach of some law is set forth, to bring the case within its jurisdiction. If the claimant pleads that the capture was without

the limits prescribed by the law, is the court to lose its jurisdiction? If so, what course is the matter to take? Is restitution to be made to the claimant without trial? Or how, or where is the cause to be tried? It should seem, that the court has the right of deciding those matters, which are alleged against its jurisdiction; and the party, who is dissatisfied with the judgment, has no remedy but by appeal to a Supreme Court of the same nation. If the fact of seizure, within a certain distance of the coast, be material, under the true construction of the law in question, who can say, whether that fact was not considered, and decided by the *French* court?

On the other hand, if that court, appearing by its style, to possess general jurisdiction in case of captures for contravention of the laws respecting commerce, has decided that the distance from the coast is not material, I know not by what principle we can inquire into the correctness of their construction of their own law. I mentioned before, that the case of *Rose* v. *Himely* was urged by the plaintiff's counsel on the trial of this cause. But it now appears, that the authority of the Supreme Court of the *United States*, on which the plaintiff relied, is to be thrown into the opposite scale. In *Rose* v. *Himely*, five judges of the Supreme Court were for reversing the judgment of the Circuit Court of *South Carolina*, by which the *French* decree was held to be conclusive. But the five judges, though they agreed that the *French* court had no jurisdiction, differed widely in their reasons. The Chief Justice and Judge *Washington* founded their opinions on the circumstance of the seizure being more than two leagues from the *French* coast. Judges *Cushing*, *Chase*, and *Livingston*, assigned as the sole reason of their opinion, that the vessel and cargo were condemned by a *French* tribunal, sitting at *Santo Domingo*, without having been carried into that or any other *French* port, and while lying in the port of *Charleston* (*South Carolina*), whither they had been carried by and with the consent of the captor. It was afterwards decided in *Hudson* v. *Guestier*, that the *French* court had jurisdiction in a case circumstanced like that described by Judges *Cushing*, *Chase*, and *Livingston*. The principle on which these three judges relied being thus over-

CHERIOT
*v.*
FOUSSAT.

ruled, the case of *Hudson* v. *Guestier* came again before the court, when a majority of the judges were of opinion, that the *French* court had jurisdiction without regard to the distance from the coast, and that it made no difference, whether the capture was in the exercise of a belligerent or a municipal right.

4. It remains to be considered whether the *French* court had jurisdiction in a case, where the thing captured had never been brought within the limits of the republic.

This question has of late years been much discussed, applied to vessels captured as prize of war. It must depend on the custom of nations; for without such custom, it does not seem essential that there should be any judicial proceeding, the property being vested in the captors by the act of capture. In cases of capture by armies on *land*, the plunder is divided among the conquerors, without process of law. Fortunately for the world, it has been thought proper to proceed differently with *marine captures*. Courts are established in all civilized nations, who proceed or profess to proceed according to the laws and usages of nations. The courts of the captor exclusively take cognisance of prizes. It is the business of those courts to inquire, whether captures have been regularly made under the authority of the nation in which they are established, and where a neutral is concerned, to ascertain whether he has done any thing which may justly subject his property to confiscation. They are to make the necessary inquiry, and give a decree of condemnation or acquittal with all possible despatch. Seizure and safe possession are all that has been deemed necessary to give jurisdiction; but whether the possession was within the dominion of the captor, or of a neutral, has not been thought material. Sir *William Scott*, who presides with great ability in the *English* court of Admiralty, seemed once disposed to think that jurisdiction could not be assumed, unless the thing captured was within the dominions of the captor; but on full research and reflection, he abandoned that principle, being satisfied that the custom of his own nation as well as of *France*, and the other principal nations of *Europe*, justified the condemnation of a prize, lying in the dominions of a neutral power. This will appear from the case of the *Hen-*

*rique* and *Maria*, 26th *November* 1799, 4 *Rob.* 35. The United States have always considered themselves bound by the law of nations; and in return they expect that in their intercourse with the nations of *Europe*, all will observe the same law. The principle that I have mentioned with regard to jurisdiction, has been recognised by the Supreme Court of the *United States* in the case of *Hudson* v. *Guestier*, 4 *Cranch.* 293., as applied not only to prizes of *war*, but seizures for breach of *municipal law*. Indeed there seems to be no ground for distinction between these two cases. The nation which makes a penal municipal law, has a right to direct the proceedings under it, in what manner it pleases, provided it does not violate the law of nations. The property, as in case of prize of war, is vested by the seizure, and continues as long as the possession. Nor has the neutral power, into whose dominions the thing captured happens to be brought, any right to devest the possession in one case more than the other. It can make no difference, that in the case now under consideration, the property was brought to the *United States* before the proceedings were instituted in the *French* court of Admiralty. Because, before the property was removed from *St. Jago de Cuba*, the papers were deposited with the public *French* agent there, and an order of sale had been made by him, because the coffee was in danger of being spoiled by the bad state of the vessel. That there should be authority to sell perishable goods, seems necessary, though like other necessary powers, it is subject to much abuse, and I am afraid has in fact been greatly abused.

Having thus considered the objections to the jurisdiction of the *French* court of Admiralty, I am led to the conclusion, that *it had jurisdiction* of the cause which it decided, and consequently that its decree vested the property in question in the captors, under whom the defendant derives his title. I am therefore of opinion that there should be a new trial. On the other reasons offered by the defendant for a new trial, I give no opinion.

YEATES J. The first question which has been raised in

1810.

CHERIOT
v.
FOUSSAT.

1810.

CHERIOT
*v.* .
FOUSSAT.

this case, is; whether the protest of captain *Anselm Hammond* should have been admitted in evidence upon the trial?

1. This point has been solemnly determined in this court in *Brown* v. *Girard*, 1 *Binn*. 40., in *December* term 1802, when the arguments on both sides underwent full consideration. Though the *English* adjudications, 7 *T. R.* 158., differ from our decision, yet such has been the uniformity of judicial opinions and practice in *Pennsylvania* for at least forty-eight years past, that I feel myself bound to acquiesce therein, whatever might be my individual sentiments on the subject, considered as a new point. At the same time, I do not hesitate to declare, that it becomes the duty of jurors, cautiously and scrupulously to weigh the credibility of such testimony, and contrast it with the peculiar circumstances of each particular case.

2. Have the transactions in the island of *Cuba*, or the proceedings in *St. Domingo*, changed the property of this coffee?

On full consideration it does not appear to me, that the mere purchase of the coffee at *St. Jago*, effected an alteration of the property by the operation of the laws of *Spain*. The unbending maxim of the common law is, *nemo potest plus juris ad alium transferre, quam ipse habet; Co. Litt.* 309. *b*; and it accords with the plainest dictates of common sense. The same rule holds in the civil law. *Traditio nihil amplius transferre debet, vel potest, ad eum qui accepit, quam est apud eum qui tradit. L.* 20 *ff de acquis. Rer. Dom.* The doctrine holds throughout all the civilized countries of *Europe*, where the civil law is adopted, as far as I can collect from the books. 1 *Domat's Civ. Law. lib.* 1, *tit.* 2, *sect.* 2, 11.; *Poth. Traitè du Contrat de Vente, part* 1. *n.* 7.; *Ersk. Institut. of Law of Scotld. vol.* 2. 485.; 1 *Johns.* 479. In all the different stages of the much contested case of *Rose* v. *Himely*, all the judges of the Supreme Court of the *United States* concurred in opinion, that as far as between neutrals, at least a sentence of condemnation is indispensably necessary to produce a complete devestiture of property. 4 *Cra.* 280, 281-2. 514.

The validity of the condemnation of the coffee at *St. Jago*, must therefore form the great object of inquiry on this ques-

tion; and I will not deny that my mind was forcibly struck during the argument, by the remarks of the plaintiff's counsel.

The schooner *Mars*, after her capture by the two *French* privateers, was carried into the *Spanish* port of *St. Jago*, where she arrived on the 7th *February* 1804. On the next day, *John Baptiste Audibert*, the *French* prize agent, ordered her cargo to be sold. Two *Spanish* merchants became the purchasers of the coffee now in dispute, and the defendant, by his supercargo *John Ribaut*, bought it from them at second hand. It arrived here in the schooner *Two Brothers*, in *March* 1804; and while in this port, and after the present suit had commenced, the condemnation took place on the 21st *July* following, having a retrospective operation on the merits of the cause.

It was insisted, that while the possession remained, the *res* might be either restored or sold, and the sentence of the court be executed; and therefore the possession was the essential fact, on which the jurisdiction of the court depended. But if the *res* be out of the power of the sovereign, he cannot act upon it, nor delegate authority to act upon it, to his courts. 4 *Cra.* 294. The whole world are, or may become parties to a suit in the court of Admiralty, either by claim, or appeal; but relief can only be obtained by application to the tribunals of justice of the country of the captors. The neutral owners cannot enjoy this benefit, however unsubstantial, if their property when arrested may be carried into one port, and proceedings to a condemnation be had in another port, however remote therefrom, of which they can have no knowledge. *Possession* must therefore be essential to the jurisdiction of a prize-court. It is the duty of a prize-court to give a prompt and fair hearing to all parties, and to restore instantly, if upon a summary examination there does not appear sufficient ground to proceed. But how, say they, can this hearing be had, and this restoration made and enforced, when the subject matter in controversy, and perhaps the captors and captured are in a foreign country? The admission of a practice so incompatible with the very constitution of a prize-court would lead to the greatest confusion. Suppose a foreign prize-court should sustain a libel against a vessel lying within one of our

own harbours, and should proceed to try, condemn and sell the same, would any person hesitate to say, that such a jurisdiction was inadmissible, that such a proceeding was *coram non judice?* To sustain jurisdiction in such a case, would be the height of injustice and absurdity. 1 *Johns.* 483.

More calm reflection has led my mind into a different train of thinking, and effaced my first impressions. I no longer view the defendant's doctrine as a degradation of our national character. It is not pretended that if by any means whatever a prize-court should be induced to condemn as prize of war, a vessel which was never *captured*, that this condemnation would operate a change of property; and it is admitted, that recapture, escape, or a voluntary discharge of the captured vessel, would deprive the court of jurisdiction. 4 *Cra.* 269. 294.

The decisions of this court agree with those of the Supreme Court of the union, that the sentence of a foreign court of competent jurisdiction directly upon the point, is conclusive evidence of the fact which it professes to decide, between the same parties, upon the same matter coming incidentally in question in another court for a different purpose. This doctrine most frequently occurs in cases between insurers and insured, where there is no express stipulation to the contrary in the policies. The respect required to be shewn to the decrees of foreign tribunals, has for its foundation that universal independence and equality of all governments, from which it results, as *Vattel* observes, " that to undertake to examine the justice of a definitive " sentence, is an attack on the jurisdiction of him who passed " it." 4 *Cra.* 511. The doctrine rests upon three very obvious considerations; the propriety of leaving the cognisance of prize questions exclusively to courts of prize jurisdiction;—the very great inconvenience amounting nearly to an impossibility of fully investigating such cases in a court of common law;—and the impropriety of revising the decisions of the maritime courts of other nations, whose jurisdiction is coordinate throughout the world. 4 *Cra.* 435. Mere locality will not of itself, deprive the prize-court of one nation of its jurisdiction, nor give jurisdiction to an-

other. The taking of prize is the foundation of admiralty jurisdiction. A prize brought into our ports by a belligerent, continues subject to the jurisdiction of the capturing power, although the *corpus* be within the limits of another jurisdiction; and it is now the general practice of the *European* nations to condemn in their own courts captured vessels carried into the ports of an ally, or even of a neutral. 4 *Cra.* 513. This practice must be submitted to, until changed by the common consent of nations; and the condemnation will bind the property. The neutral sovereign cannot wrest from the possession of the captor, a prize of war brought into his ports. 4 *Cra.* 295. The particular mode of introducing the subject into the court, or in other words, of instituting the particular process which is preliminary to the sentence, is properly of municipal regulation, uncontrolled by the law of nations, and therefore is not examinable by a foreign tribunal. 4 *Cra.* 297. Our citizens if injured, cannot be redressed in our courts, for the errors or injustice of foreign adjudications. In such cases, they must look to their government for protection and compensation. The possession of the captor is in principle, the possession of his sovereign; he is commissioned to seize in the name of the sovereign, and is as much an officer appointed for that purpose, as one who in the body of a county serves a civil process. He is under the control and direction of the sovereign, and must be considered as ready to obey his commands legally communicated through his courts. 4 *Cra.* 296. I will conclude my remarks on the present question, with the expressions of Mr. Justice *Johnson* in 4 *Cra.* 285. " The de-" cisions of foreign prize-courts do not derive their effect "from their abstract justice; they are in this respect analo-" gous to the acts of sovereignty. They are universally con-" clusive, because no where subject to revision. Among " nations they are considered as intitled to the same validity, " as the decisions of municipal courts, within their respec-" tive territories, and preclude the rights of parties, although " contrary to every idea of law, reason and evidence."

Much reliance was placed during the argument of this case, on the reversal of the judgment of the Circuit Court of *South Carolina*, in *Rose* v. *Himely*, by the Supreme Court,

1810.

CHERIOT
v.
FOUSSAT.

The opinion of the court was delivered by *Marshall* Chief Justice, in which Mr. Justice *Washington* concurred, that the prohibition by *France*, by the arrêté of 1st *March* 1804, of all trade with the revolted blacks of *St. Domingo*, was an exercise of a municipal, and not of a belligerent right; and that seizures beyond the limits of the territorial jurisdiction of two leagues from the coasts of that island, for breaches of the municipal regulation, were not warranted by the law of nations, and could not give jurisdiction to the courts of the offended country. This opinion, together with that of Mr. Justice *Johnson,* who dissented therefrom, is reported in 4 *Cranch* 268. 281. *Cushing, Chase* and *Livingston* Justices assented to the judgment, without expressing an opinion on the validity of a seizure on the high seas under a municipal regulation, upon the ground, that the vessel and her cargo were condemned by a *French tribunal* sitting at *St. Domingo*, without having been carried into that or any other *French* port, and while lying in the port of *Charleston, South Carolina*, whither they had been carried by and with the consent of the captor. The case of *Hudson et al.* v. *Guestier* was decided at the same time, and the judgment therein having been reversed, was sent back to the Circuit Court of *Maryland*, under a mandate for further proceedings. It now appears that a new trial was had in that suit, wherein the court directed the jury, that it was wholly immaterial at what distance from the coast of *St. Domingo* the vessel was taken, the property being by the capture and sale devested out of the plaintiffs, and who therefore were not intitled to recover. The plaintiffs' counsel took a bill of exceptions to this opinion; and a verdict and judgment passed for the defendant, upon which a writ of error was brought. The judgment of the Circuit Court was affirmed in *February* term 1810, by the opinions of *Johnson, Livingston* and *Tod*, so that the principle of the decision in *Rose* v. *Himely* is now overruled. I trust that I stand on safe ground, when I assent to the opinion of a majority of the judges of the Supreme Court of the *United States* on a much controverted point; and am therefore of opinion, that the proceedings in *St. Domingo* devested the property of the coffee out of the plaintiff.

3. It may be deemed unnecessary for me to express any opinion, whether this court have jurisdiction over the present subject? This point was reserved on the trial. I shall content myself with observing, that I see no reason for receding from the unanimous opinion of the members of this court, upon this point, in *Ross's Executors* v. *Rittenhouse.* The authorities upon which our judgments were formed, are detailed in the report of that case, 2 *Dall.* 164., which I will not now repeat. If the plaintiff could have sustained his suit on its merits, I think his proper remedy was in the District Court, and not in a court of common law.

Upon the whole, I am of opinion that a new trial should be awarded.

BRACKENRIDGE J. By article 3, sec. 2, of the constitution of the *United States,* it is provided, that "the judicial "power shall extend to all cases of admiralty and maritime "jurisdiction." This might be construed as giving to the courts of the *United States* exclusive jurisdiction of all admiralty and maritime cases; but the judiciary law of the *United States,* 1 *U. S. Laws* 54., has not construed it so extensively; for by sect. 9 of that law, there is a saving to "suitors in all cases, of the right of a common law remedy, "where the common law is competent to give it." A suitor therefore has a right to demand of the court of any state, the remedy of a wrong, where the common law is competent to give it. It follows, that it is demandable of this court, that we give a remedy in this case of alleged wrong, if we are competent to give it.

Our competency will depend upon the question, are we excluded from the "jurisdiction?" Cases of admiralty and maritime jurisdiction, in the meaning of the constitution, must have a reference to cases of that nature as they were understood before the framing of the constitution; and that understanding must have a reference to the admiralty and maritime jurisdiction of the courts of *England,* whence we have drawn our laws. In the courts of *England,* the boundaries are clearly settled, both as to where the jurisdiction is concurrent, and where it is exclusive. The cases of prohibition shew where the admiralty and maritime courts may

1810.

CHERIOT
*v.*
FOUSSAT.

have a concurrent jurisdiction: where they take exclusively may also be seen from the *English* cases. That of *Le Caux and Eden*, Doug. 572., may lay a foundation of this examination in tracing the cases.

The admiralty and maritime jurisdiction of the *United States* must therefore be the same with that of the *English* courts, as to what they shall possess exclusively of the common law courts of the individual states; and what the courts of the *United States* cannot exclusively take, we must concurrently possess. It is clearly settled by the *English* cases, that it is not the place, *supra altum mare* or high seas, but the *nature of the question*, that must determine. Of what nature then must the question be that will exclude? The answer to this may be anticipated from the reason of the thing, even were not the decisions of the courts very clear upon this head. The purport of these is, that it must be a question which will involve a claim of some foreign power originally or derivatively; that is, immediately from the foreign power, or derivatively, by some claiming under it. For it must be a question, on the determination of which the preserving peace with some foreign power may depend. Every case of capture *as prize of war*, *must be of this nature*. A case of seizure and condemnation for the violation of a prohibitory law, with relation to the subjects of a foreign power, is within the same reason, and must be of the same nature. For the sovereign has a right to prohibit an intercourse with all, or any part of his dominions. The subject of a foreign power violating such a prohibition, subjects himself by the law of nations to the forfeiture of the prohibition. If a forfeiture of the property be the commination, that property may be seized. But the subject of the foreign power is under the protection of his sovereign, to whom the power prohibiting is answerable for the seizure of the property. He is bound to shew the grounds of the seizure, that it may appear to be justifiable. It ultimately comes therefore to be a question between the respective sovereigns, whether at peace with each other or at peace with all the world. Why is it that capture *jure belli* is made cognisable only in what are called prize-courts, but in order the better to preserve the relations of amity with other powers, with whom

the nation is at peace. The capture of a vessel of a neutral nation for a breach of a blockade, is triable only in a prize-court. In the *American* revolutionary war, the vessels of other nations trading with the revolted colonies, and seized, which case is analogous to that of *France* and *Hayti*, the capture, or rather *seizure*, as before the declaration of war with those nations it strictly was, could be triable only in the prize-courts. Could cases of this nature have been tried in the instance courts of Admiralty? Or were they exclusively cognisable in the prize-courts? A prize-court of a nation, may be considered in the light of a commission of inquiry on behalf of the sovereign of the captor, to inform the conscience of the sovereign, and direct his policy. This at least seems now the only use that is made of it. Does not the same sense of justice, or dictate of good policy, direct an inquiry in the case of a seizure for the violation of a prohibitory law, as in the case of a capture *de jure belli?* Is it not as necessary for the preservation of peace in the one case as in the other? Is there not as much reason that it be in the court of the sovereign peculiarly appointed for inquiring into cases where the relations with foreign powers may be affected, in the one case as in the other? I take it, that on principles deducible from the limitation of the jurisdiction of the *English* courts, a seizure of a foreign vessel for the violation of a prohibitory law, would be inquirable into *only* in the prize-court, and *not concurrently* in the instance court of Admiralty. If not concurrently in the instance admiralty court, the common law courts of *England* could not take jurisdiction. If so, we cannot; for it is to that jurisdiction only that we succeed, under the clause of the judiciary act of the *United States,* which saves the common law remedy. I lay aside the case of *Hughes and Cornelius,* or any other which may seem to countenance the idea that the legality of capture incidentally coming into view, but not so far as to affect the *res,* may be inquirable into in a common law court. For though it is the conclusiveness of the sentence of the foreign court of Admiralty, that is given as the reason of sustaining the change of property by the condemnation and sale, yet the paramount and better reason dedu-

cible from principle would have been, that the legality of capture was a prize question, and not inquirable into in the common law court. It does not militate with this principle, that in a policy of assurance, of which the common law courts hold cognisance, the fact of condemnation may come into view, or that even the legality of the sentence may come into view, as some contend it ought to do; because this is a question, not between sovereign and sovereign, except so far as respects the subject of the sale and condemnation; and so far as respects that, we see that the prize-courts have exclusive jurisdiction. The legality of capture, condemnation, sale, &c. on a policy of assurance, is a collateral question by the terms of the policy, and is made a covenant, of which the common law courts have cognisance. It is not the condemnation, but the condemnability, in the case of a policy of assurance, that is in question; and which may be inquired into, independent of the fact of condemnation.

Considering forfeiture under a prohibitory law, as giving a right of seizure, in the same manner as the breach of blockade gives the right of capture, it will follow that the property forfeited may be pursued and taken on any seas, excluded only by the jurisdictional limits of another power; so that it would not make any difference with me, whether the seizure was within the territorial jurisdiction, or without upon the high seas, after a forfeiture legally incurred; nor whether the seizure was for the actual entry of a port, or for hovering within the jurisdiction, and raising the presumption of an intention to enter, such hovering being prohibited. As to the limits of the jurisdiction alleged to be violated, territorial jurisdiction seems to be what any nation chooses to make it, and what other nations will suffer it to be. If this extent is to be contested, it must lie with the sovereign power of a state to say what that of another shall be. I do not know that our government has said what shall be the territorial jurisdiction of *France, in Europe or the Indies;* and until that is done, we cannot say what it shall be: for the law of nations, which is a part of our common law, has not ascertained this distance without controversy. In case of vessels bound to the *United States*, our government exercises the right of *search* to the extent of *four leagues.*

In the opinion of *Azuni*, the territorial extent for the purpose of subjecting *vessels to the visit of revenue officers*, ought to be contracted, rather than enlarged as in the case of protection. I have not the facts of this case so fully in my mind, as to recollect with certainty whether the capture was of a vessel which had violated the prohibitory law, by entering a port of the island, or only by hovering within the two leagues, and subjecting herself to the reasonable suspicion of an intention to enter; or by having entered a port, and having escaped to a greater distance than two leagues; or by having only been within the two leagues, and having then escaped without the two leagues and been captured. But I take it that she had entered and traded, and had then escaped to a greater distance than two leagues; because if she had been taken within the two leagues, even hovering, without being able to account for it, there could be nothing said; or even if she had been hovering with intention to trade, and had afterwards escaped without the two leagues, I do not think she ought to be protected against seizure, or reclaimed by her country, much less if she had actually entered a port and afterwards escaped to any distance. I would consider her as liable to the penalty, wherever found, and seizable by the *injured power*, unless within the territorial jurisdiction of another state.

But it will be said, that whether capture as prize of war, or seizure for the violation of a prohibitory law, be alleged, it must be examinable whether such capture or seizure and condemnation have been legally made. The sentence of a foreign court of Admiralty will not conclude as to such capture, or seizure and condemnation, but the legality of these will be examinable to a certain extent. It is so determined by the Supreme Court of the *United States*. Going as they presume on the same law which is adopted in the *English* courts, they have determined in the case of *Rose* v. *Himely*, 4 *Cranch.* 241., that the capacity of the court to act upon the thing condemned, arising from its being within, or without their jurisdiction, as well as the constitution of the court, may be considered by that tribunal which is to decide on the effect of the sentence. " The court will examine the constitutional

1810.

CHERIOT
v.
FOUSSAT.

"powers of the tribunal, the character in which it acted, and
"the situation of the subject on which it acted." I under-
stand this to be spoken of any court, admiralty or common
law court. If such a qualification of the general rule as to
the conclusiveness of a foreign sentence can be supported, it
may turn a capture, and what purports to be a condemnation,
into a *marine trespass*, and give a common law jurisdiction;
though it would seem to involve an inconsistency, to say that
the primary and principal act of the court, the assuming
jurisdiction, should be examinable, and not the justice of the
adjudication; or that reasons of policy which forbid in the
one case, should not exclude in the other; and this not con-
fined to the courts of the sovereign of a peculiar jurisdiction,
but that the sentence of even a foreign court of Admiralty
is examinable to a certain extent in a common law court.
Assuming this to be the law, let us examine the sentence in
the case before us, as to its effect upon the property in ques-
tion. It is said to be posterior to the sale. If so, it would
seem that it would not protect the sale. The owner is not
devested of his property by capture, but only by condem-
nation. If in the mean time it comes into his possession, by
recaption, the vendee cannot set up the sentence as a bar;
2 *Burr.* 694.; though there has not been an actual recaption
by the owner, but a legal one by attachment of a suit brought.
For the vendee being in no better situation, until condem-
nation, than the captor, the property may be recaptured in his
hands on the high seas, or attached within the municipal
jurisdiction of any country, by applying to the laws which
regulate the mode by which property wrongfully detained
may be recovered. And under these laws, a suit instituted,
must be the same thing as a manucaption or taking posses-
sion of the property. There would seem to be the same rea-
son in the one case as in the other. Can there be a distinction
taken between the case of seizure and the case of capture,
with regard to a change of property? By the violation of the
law, or declaration of the will of the sovereign, a forfeiture is
incurred, and a right to seize accrues; seizure gives pos-
session and an eventual right of property; but that right is
suspended until the will of the sovereign is declared upon
the particular subject. There can be no transfer in the mean

time, at public or at private sale. Even the officers of the cap‑ turing power can have no authority to transfer, until the will of the sovereign is expressed, and the seizure legitimated by a sentence of his court. It is contrary to the law of nations, and contrary to good policy, that it should be otherwise. For though there is no *jus postliminii*, no right of recapture in the case of seizure, it is because in the nature of the case it cannot exist, any more than in the case of a breach of blockade; the matter being between powers supposed to be at peace in the one case, and between powers at war in the other. An enemy may retake himself if he can, or his own vessel, and his sovereign will protect him; and it is not a question of right but of power to hold the property. But in case of a forfeiture, the penalty is incurred and the debt is due, and may be exacted without any right of self-deliver‑ ance; but, nevertheless, an act of the sovereign of the seizing power must pass upon it, in order to ascertain the subject, and the legality of the seizure made.

Admitting that there might be a change of property as *amongst the subjects of the seizing power*, by a sale by ad‑ miralty decision, can the courts of other nations regard a transfer that is not previously covered with a sentence of condemnation, that has not this to produce as the title deed or evidence of the property of the goods purchased?

The reason on which respect is paid to a foreign court of Admiralty, so as to protect the subject of a sale, is the main‑ taining the relations of amity with foreign powers. Is not a comity founded in this reason carried far enough, when we respect the sentence of the court, by supporting the sale made under it, without confirming it by relation? That is a step far‑ ther; and is there any good policy to warrant it? Is it not enough if they are protected after condemnation? The pur‑ chase is otherwise at the risk of the purchaser, that if he take the property out of the dominions of the power seizing, he cannot call upon the municipal law of another country to protect him.

But in this case it is said that the property is covered by a sale made by an agent of the foreign government, by the *French* agent at *St. Jago de Cuba*. The *British* government would seem, as in the case at *Lisbon*, to have commissioned

consuls with special power to make sale of the perishabl property captured and brought in; and this as under the special and immediate order of the court of admiralty; and which sale will amount to a change of property, and protect the vendee, let the consequence be an acquittal or condemnation. If that be the usage, and it has become the law of nations, the law of the *French* government authorizing agents in cases of necessity, that is, in cases of perishable property, cannot have a less effect. In that case, the property here will be protected in favour of the vendee. The sentence however does not refer to this sale, or on the face of it ratify the sale. But in the case of a sale by an order of the Admiralty Court, which may be legally made, is it necessary that the sentence should recite and expressly sanction the sale? If not, why should it be necessary in the case of a sale by a consul, or an agent authorized by the sovereign of the captor?

But, *are not these considerations proper for the determination of the prize-court?* For, admitting that the Admiralty Courts of one nation, have a right to judge of the jurisdiction of the Admiralty Courts of another nation, though it would seem to involve an inconsistency to say that the assumption of jurisdiction, which is the principal and primary act of the court, and not the legality of the adjudication or sentence on the merits, should be examinable, the same reasons of policy which forbid in the one case, would seem to exclude in the other, and every court is presumed to be a competent judge of its jurisdiction; nevertheless, I say, admitting that the jurisdiction is examinable to a certain extent, is it competent to any but the Admiralty Prize-court to examine? " If " the taking has been as a prize, though from want of legal " condemnation there has not been a complete prize, claim " of restitution must be in the prize-court. If in any other " way a suit for restitution is proper in the instance court, " it is not easy to conceive such a case unconnected with " either piracy or war. We may however suppose or ima-" gine a case of possession unlawfully taken, where no cir-" cumstance of capture in war was concerned, as if there was " a disputed property in a ship, and one of the claimants " prevailed upon the master at sea to betray to him the pos-

"session previously held by the other. In such a case a suit
"by the latter in the Admiralty for restitution would be
"proper. Some think that such would be a case for the
"instance court, and that the question of prize comes in
"only incidentally; but surely taking as prize, though ille-
"gally, or purchasing from such a taker, is equally a question
"for the prize-court, as legal capture and purchase thereof;
"and accordingly the case of the *Perseverance*, *Pittar*, in
"2 *Robinson's Rep.* which was of the former kind, was
"tried in the prize-court. Where the consideration of pro-
"perty comes in incidentally, and in such a manner as is
"not disputed between the parties, the court doth judge,
"though the question of property can hardly there be said
"to be before it; but the suit always purports to be in a
"possessory cause civil and maritime."

These observations are extracted from 2d *Brown Civ. and
Adm.* 113. 115., who goes on to add, that though such suits
for restitution may be proper in the Admiralty, yet it may
be asked whether the courts of common law have not here
concurrent jurisdiction; for though the tort be committed
upon the sea, the main question is a simple question of pos-
sessory right between man and man, and which in its nature
savours not necessarily of a marine business. Lord *Mans-
field* has answered this question in the case of *Lindo* v. *Rod-
ney;* " a thing," says he, " being done upon the high sea,
" does not necessarily exclude the jurisdiction of the courts
" of the common law; for seizing, stopping, or taking a ship
" upon the high seas, not as prize, an action will lie; though
" for taking as prize, no action will lie. The nature of the
" question excludes not the locality. The proper distinction
" seems to be, that if the suit be in *rem* for the restitution
" of the ship itself, the suit should be in the Admiralty.
" If for *damages only*, at common law. But Sir *Leoline*
" *Jenkins* agrees with the attorney and solicitor-general of
" his time in opinion, that even for *spoil and damage* and
" loss of time or demurrage occasioned by violence, suits
" might be brought either in the courts of common law, or
" in the Admiralty. But he adds weighty reasons for pre-
" ferring the latter. Having, says he, the authority of two

" such eminent persons in the law, that this cause of spoil is " cognisable in the Admiralty, I will only add besides, that " it has been always so, till some late interruption; and that " it is not without special ease and satisfaction to a foreign " plaintiff, that he shall have the benefit of the same marine " laws here, by which we are judged in his country: and " instead of entering as many actions of trover and conver- " sion as there are parties to the spoil, and proprietors of the " ship and goods, need enter but one single action in the Ad- " miralty. In many cases of this kind, an action of trover has " been brought, and in others the language of the court " seems to imply, that this or replevin was the more proper " method." p. 117.—" When formerly the Admiralty was " permitted to try petitory suits, or causes of property, di- " rectly, it was held that the sentence of the Admiralty on " the property of a ship taken upon the sea was final, *and* " *it should not afterwards be tried in trover.*" p. 113.—" The " ground of these determinations seemed to be, that where " the Admiralty has cognisance of the principal, it has also " of the incident; yet that is only where the whole makes " one continued act, and here the purchase is severed from " the first taking, and it becomes a mere question of pro- " perty on land. But this seems subtilty. The sale is surely " a continuation of the violence; and as we see that in the " prize-court the validity of such a sale after a capture in war " would be tried as inseparable from the prize question, why " should not the same rule apply in the instance court to " takings not by an enemy." p. 118.

So far the sentiments of this elementary writer, to which I subscribe, and add that I can see no distinction between the instance court being excluded from a proceeding in *rem*, and sustaining a proceeding for damages on account of the taking or detention, where the taking has been as prize. For the same reasons of policy would require the intervention of the peculiar jurisdiction of the prize-courts in the one case as in the other; and if questionable in the instance court of Admiralty, so at least in the common law court.

Are there not reasons arising from the constitution of the federal government, that render it necessary to confine the

jurisdiction of the common law courts of the states? The common law courts of *England* are national courts, though not the courts of the government, in other words the executive, as the admiralty courts in a great measure are in that country. But the courts of a state are not with regard to the states, the same as the superior courts in *England* are with regard to the whole people of *England*. This would seem to make a difference in policy, and to exclude more forcibly the jurisdiction of the common law courts, where prize may come in question, which is a question that involves the peace of the community of states, and ought to be alone cognisable in a court of the whole states.

This consideration would perhaps not seem to have been duly weighed by the legislature of the union, in the judiciary act, in saving a common law remedy in the state courts where the constitution would have warranted an exclusive jurisdiction to the courts of the union in all matters of admiralty jurisdiction, whether as instance or prize-courts.

But on the ground of policy I will consider them as not intending to give jurisdiction to the state courts, where prize, or its incidents or consequences come in question.

New trial granted.